James F. THOMPSON, Appellant,

v.

Gail HUECKER, Individually and as Commissioner of Department of Economic Securities, Cattie Lou Miller, Individually and as Commissioner of the Department of Personnel, Enos Swain, D. J. Carty, Ralph Homan, James Way, and Phillip Taliaferro, as the Personnel Board, all of the Commonwealth of Kentucky, Appellees.

Court of Appeals of Kentucky.

Dec. 9, 1977.

Arthur L. Brooks, Brooks, Sullivan & Saunders, Lexington, for appellant.

Edward F. Prichard, Jr., Frankfort, Martin Glazer, Asst. Atty. Gen., Frankfort, for appellees.

Before MARTIN, C. J., and PARK and WHITE, JJ.

PARK, Judge.

This proceeding arises out of the termination of the employment of the plaintiff-appellant, James F. Thompson, as Chief Personnel Officer of the Department of Economic Security. Thompson's appeal to the state personnel board was denied. Thompson subsequently instituted an action in the Franklin Circuit Court challenging the order of the state personnel board and seeking, monetary damages from the defendants-appellees, Gail Huecker and Cattie Lou Miller. At the time, Huecker was Commissioner of the Department of Economic Security, and Miller was Commissioner of the Department of Personnel. Thompson appeals from the judgment of the Franklin Circuit Court dismissing his complaint.

Two separate questions are presented by the appeal: (1) whether the circuit court erred in affirming the order of the state personnel board, and (2) whether the circuit court erred in sustaining a summary judgment dismissing Thompson's claim for damages against the two commissioners.

## FACTUAL BACKGROUND

On July 28, 1972, Thompson was the Chief Personnel Officer of the Department of Economic Security. Having been employed by the state for nearly eleven years, Thompson had acquired "status" and was entitled to all of the protections of the "merit system" provided by KRS 18.110 to KRS 18.340.

On July 28, 1972, Governor Ford signed an executive order approving the reorganization of the Department of Economic Security. On the same day, Huecker as Commissioner of the Department of Economic Security submitted a "layoff plan" to Miller as Commissioner of the Department of Personnel. The "layoff plan" reflected that the position of Chief Personnel Officer was being abolished and that Thompson would be "terminated by layoff." Miller approved the layoff plan immediately. On July 28, 1972, Huecker also wrote Thompson a letter informing him of his "termination" from the position of Chief Personnel Officer effective at the close of business July 28, 1972. The letter stated:

> The reason for this layoff is that the Department of Economic Security has been reorganized and the functions formerly performed by the position of Chief Personnel Officer have been absorbed, along with other duties, into the position of the Administrator of the Office of Staff Services. This material change in organization renders the position of Chief Personnel Officer in the Department of Economic Security an excess position which must accordingly be abolished.

The letter also informed Thompson of his right to appeal his termination to the personnel board.

Thompson did not receive the letter of termination until July 31, 1972. Thompson immediately sent Huecker a memorandum characterizing the effort to terminate his services as "a blatant political act." Thompson also informed Huecker of his decision not to vacate the office of Chief Personnel Officer.[1]

---

1. The full text of the memorandum from Thompson to Huecker dated July 31, 1972, is as follows:

 This is to acknowledge receipt of your letter of July 28, received by me at 10:10 A.M., July 31, 1972, advising me of my dismissal (referred to as a layoff). I have reviewed your letter carefully and because of recent events, it is my decision not to vacate this office. The move to reorganize and accordingly terminate my services is a blatant political act

On August 3, 1962, Thompson appealed to the personnel board by a letter to Commissioner Miller. In that letter, Thompson appealed the action terminating his services on the ground that it was "a blatant political maneuver to remove me from the employment of the department."[2]

On November 22 and December 8 of 1972, hearings were conducted by the personnel board. On December 18, 1972, following oral arguments by the attorneys, the personnel board rendered its written opinion and order sustaining the layoff of Thompson and denying his appeal. The personnel board also recommended that "a real effort" be made by Commissioner Huecker and others to find proper employment for Thompson.

On December 27, 1972, Miller placed Thompson on the reemployment list maintained by the Department of Personnel in accordance with the provisions of KRS 18.110(15) and KRS 18.210 and the regulations thereunder. On December 27, 1972, Thompson made a formal written request to the Department of Personnel seeking reemployment by the state. On January 8, 1973, Thompson filed suit in the Franklin Circuit Court seeking to overturn the order of the personnel board and to recover damages from Huecker and Miller. Thompson was subsequently employed by the Kentucky Commission on Aging on March 13, 1973. His starting salary was less than he had been receiving as Chief Personnel Officer for the Department of Economic Security.

## ORDER OF THE PERSONNEL BOARD

### Findings of Fact

Under KRS 18.210(17), merit-system employees may be discharged "only for cause." KRS 18.270 provides that any employee who was dismissed "for any political, religious, or ethnic reason" shall be rein-

and one to which I will not be a party by acceding to your demand.

The customary two weeks notice, which any considerate, well intentioned employer would grant, is lacking in this instance. It places me in a distinct disadvantage in being unable to seek employment during the fourteen day period.

I have in my eleven years of employment been a diligent, conscientious and hard working individual. I have devoted the better portion of my adult life to the Commonwealth of Kentucky and specifically to the Department of Economic Security. Your termination notice would deprive me of the maximum accrued sick leave and sixty-five hours of annual leave, for which I am permitted compensation. I can only assume, and I am sure correctly, that the sudden and swift swish of the ax has come about as a result of a law suit filed against you for violation of Chapter 18, Kentucky Revised Statutes. This action, which is part of a conspiracy to deprive me of gainful employment because of political opinion, contravenes Title 18, Section 601 of the U.S. Code.

With proper respect to what you want, I decline to vacate this office.

2. The full text of the letter of appeal from Thompson to Miller dated August 3, 1972, is as follows:

Ostensibly pursuant to provisions of Personnel Rule 13, I was advised by Ms. Gail Huecker, Dept. of Economic Security, of the termination of my services with the agency. This action occurred at 10:10 A.M., on July 31, 1972, and was retroactive to 4:30 P.M., July 28, 1972, shortly after I filed suit in Franklin Circuit Court, against her and members of the Democratic Executive Committee. As advised by Ms. Huecker, and consistent with provisions of Personnel Rule 14, I wish to appeal this prejudiced action to the State Personnel Board. The basis for my appeal is that the action taken by Ms. Huecker, is a blatant political maneuver to remove me from the employment of the department. Her actions contravenes [sic.] provisions of the Personnel Rule and Regulations and provisions of Chapter 18, Kentucky Revised Statutes.

I have been scheduled to appear before the Personnel Board on Friday, August 11, to present evidence of political machination in the personnel management program in the department. I petition your consideration to schedule my appeal also at this time.

In the absence of your favorable consideration I request my appeal to be scheduled before the entire board within thirty days. I recognize that hearing examiners are being used now, however, I believe the entire board should convene for this case because of the unusual circumstances and of the evidence to be presented.

I further request you forward to me immediately appropriate forms to order the appearance of fifty witnesses, both within and without state government.

stated with back pay. These two statutes were harmonized by the court in *King v. Sermonis,* Ky., 481 S.W.2d 652 (1972), the court stating:

> Under this construction of the statute, the provisions with reference to a finding of political, religious or ethnic reasons for a discharge, and to "all other cases," apply only where the board first had found the existence of a cause that would be a legal ground for discharge; the board may find that the discharge actually was for political, religious or ethnic reasons rather than for the technical cause found to exist; or the board may find that there are mitigating circumstances such as to warrant a *recommendation* for reinstatement even though legal cause for discharge exists.

*Id.* 481 S.W.2d at 655. Commissioner Huecker had the burden before the personnel board of proving that the reorganization plan resulting in Thompson's dismissal was valid. Thompson had the burden of establishing that his discharge was politically motivated. *Goss v. Personnel Board,* Ky., 456 S.W.2d 824, 827 (1970). The findings of fact of the personnel board will be examined in light of principles laid down in the *King* and *Goss* cases.

In its order of December 18, 1972, the personnel board made the following findings of fact:

1. Appellant, James F. Thompson, was personally and politically unacceptable to the present Administration.

2. Prior to this reorganization a great many of Thompson's duties were removed from him and reallocated.

3. The reorganization itself, however, was effected pursuant to the recommendations of a professional consulting firm, and the testimony of Mr. Patterson, who admitted that he "quarterbacked" the plan, established that he felt that the Department could function more efficiently if the position of Director of Personnel were abolished and the function absorbed into the Office of Staff Services.

4. Appellant was laid off as result of the recommendations emanating from this study and there was insufficient proof upon which to base a finding that the reorganization plan was designed or used specifically for getting rid of appellant.

5. There was nevertheless, little effort made to relocate Mr. Thompson in State government.

Thompson asserts that these findings of fact are erroneous because his layoff, in fact, was politically motivated.

■ There was substantial evidence to support the board's findings of fact, and they will not be disturbed by this court on appeal. *Wagner v. Dept of Education,* Ky., 549 S.W.2d 300 (1977); *Kentucky State Racing Commission v. Fuller,* Ky., 481 S.W.2d 298 (1972). The reorganization plan was prepared by Jerry Lee Paterson, a management and computer systems consultant from Pennsylvania. Patterson had previously done similar consulting work for the State of Oklahoma and the State of Mississippi. Under the reorganization plan, the primary responsibilities of the Chief Personnel Officer were absorbed into the Office of Staff Services. However, the Deputy Commissioner for the Office of Staff Services would have other significant responsibilities not previously exercised by Thompson as Chief Personnel Officer. The personnel board was not compelled to find that the reorganization plan was implemented for the purpose of getting rid of Thompson.

We hold that there was substantial evidence to support the findings of fact of the personnel board.

*Conclusions of Law*

■ Based upon its findings of fact, the personnel board reached the following conclusions of law:

> The layoff of appellant was in compliance with Chapter 12 of KRS and this Board's rules pertaining to such actions providing for the abolishing of positions in a formal reorganization program, although it does illustrate somewhat of a

"loophole" for the removal of *personna non grata*. There also was a failure to prove a political motivation in reorganizing for the particular purpose of terminating Thompson, and the layoff was, therefore, lawful.

Thompson asserts that the board's conclusions of law are erroneous in light of the board's finding that Thompson was personally and politically unacceptable to the current administration. KRS 18.270 contains a flat prohibition against dismissal of a merit-system employee for any political reason. Firing a merit-system employee for political reasons is prohibited even though a technical cause for dismissal might also exist. *King v. Sermonis, supra.* We also note that the dismissal of a government employee in a *non-policy making* position solely for partisan political reasons is unconstitutional under the 1st and 14th Amendments to the United States Constitution. *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). The fact that Thompson was "politically unacceptable" does not place him in a better position with respect to the reorganization plan than an employee who was politically neutral or acceptable. Thompson had the burden of proving that politics was a motivating factor in his dismissal under the reorganization plan. Even if Thompson sustained that burden of proof, Huecker and Miller were entitled to prove that the same decision respecting Thompson's layoff under the reorganization plan would have been reached in the absence of his political unacceptability. *Mt. Healthy City School District v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 575–76, 50 L.Ed.2d 471 (1977).

█ The board's conclusions of law are supported by its findings of fact. There was substantial evidence to support the board's conclusion that Thompson's layoff was not politically motivated.

### Failure to Place Thompson in Another Position

Thompson contends that his layoff was unlawful because it was not carried out in compliance with the personnel rules then governing such a layoff. When a merit-system employee's position was abolished, Rule 13.2(c) of the personnel rules promulgated by the Department of Personnel (now 101 KAR 1:120, § 2) provided:

The appointing authority and the Department shall attempt to place the employee in another position for which the employee is qualified.

Because the personnel board found that little effort had been made to place Thompson in other employment, he argues that his layoff was invalid.

█ Thompson's argument ignores other applicable regulations. Rule 9.6 of the personnel rules (now 101 KAR 1:080, § 6) provided in part:

Any employee with status, who has been placed in a lay-off category, shall have first priority for consideration in filling any vacancy in a covered position for which he is qualified in any department in any geographic area. A status employee in the lay-off category must indicate in writing to the Department of Personnel that he desires re-employment.

Rule 8.7 of the personnel rules (now 101 KAR 1:070, § 7) provided in part:

Any employee with status who has been laid off in accordance with Rule 13 shall be entitled to have his name on a re-employment list for the class of position from which laid off, provided he so requests in writing.

Construing all three rules together, we conclude that a reorganization plan which abolished merit positions could be implemented prior to finding other positions for the laid-off employees. Any other interpretation would stifle bona fide efforts to modernize state government. The interest of the laid-off employee can be protected by placing his name on the re-employment list, if he so requests in writing. If he is on the re-employment list, no vacancy can be filled without first giving him full consideration for employment. If, for political reasons, the employee is not offered another position for which he is qualified, the employee may seek redress before the personnel board. KRS 18.310(1); KRS 18.270; 101 KAR 1:130, § 1.

Thompson did not make a written request that his name be placed upon the re-employment list until December 27, 1972. No request for employment in another position is contained in his memorandum of July 31, 1972 to Commissioner Huecker, or his appeal letter of August 3, 1972, to Commissioner Miller. Thompson took the position that he would not vacate his office and that the effort to terminate his position as Chief Personnel Officer was illegal. In the absence of a request for re-employment, Huecker and Miller were under no duty to attempt to find another position for Thompson.

### Ruling

The circuit court did not err in affirming the order of the personnel board.

### CLAIM FOR DAMAGES AGAINST COMMISSIONERS HUECKER AND MILLER

Miller's counsel asserts that she violated no mandatory ministerial duty respecting Thompson's re-employment. Huecker's counsel contends that the doctrine of official immunity protects her from personal liability for the alleged damages suffered by Thompson. The defense of official immunity is based upon a line of federal cases.

In *Spalding v. Vilas*, 161 U.S. 483, 16 S.Ct. 631, 40 L.Ed. 780 (1896), the Supreme Court held:

We are of opinion that the same general considerations of public policy and convenience which demand for judges of courts of superior jurisdiction immunity from civil suits for damages arising from acts done ·by them in the course of the performance of their judicial functions apply, to a large extent, to official communications made by heads of executive departments when engaged in the discharge of duties imposed upon them by law. The interests of the people require that due protection be accorded to them in respect of their official acts. As in the case of a judicial officer, we recognize a distinction between action taken by the head of a department in reference to matters which are manifestly or palpably beyond his authority, and action having more or less connection with the general matters committed by law to his control or supervision. . . . In exercising the functions of his office, the head of an executive department, keeping within the limits of his authority, should not be under an apprehension that the motives that control his official conduct may at any time become the subject of inquiry in a civil suit for damages. It would seriously cripple the proper and effective administration of public affairs as intrusted to the executive branch of the government, if he were subjected to any such restraint. He may have legal authority to act, but he may have such large discretion in the premises that it will not always be his absolute duty to exercise the authority with which he is invested. But if he acts, having authority, his conduct cannot be made the foundation of a suit against him personally for damages, even if the circumstances show that he is not disagreeably impressed by the fact that his action injuriously affects the claims of particular individuals.

161 U.S. at 498–99, 16 S.Ct. at 637. In considering the application of the *Spalding* case, it should be noted that Huecker and Miller were both heads of departments, and, as such, they were both members of the Governor's cabinet. KRS 11.060 and KRS 12.020(II)(13) and (17).

In *Barr v. Matteo*, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), the Supreme Court extended the absolute immunity or privilege announced in the *Spalding* case to lower echelon federal officers. The Supreme Court stated:

The complexities and magnitude of governmental activity have become so great that there must of necessity be a delegation and redelegation of authority as to many functions, and we cannot say that these functions become less important simply because they are exercised by officers of lower rank in the executive hierarchy.

To be sure, the occasions upon which the acts of the head of an executive department will be protected by the privilege are doubtless far broader than in the case of an officer with less sweeping functions. But that is because the higher the post, the broader the range of responsibilities and duties, and the wider the scope of discretion, it entails. . . .

360 U.S. at 573, 79 S.Ct. at 1340. Despite the apparent breadth of official immunity provided by the *Spalding* and *Barr* cases, the Supreme Court has placed a definite limitation upon the doctrine of absolute official immunity.

In *Doe v. McMillan,* 412 U.S. 306, 93 S.Ct. 2018, 26 L.Ed.2d 912 (1973), the Supreme Court held that the Public Printer and the Superintendent of Documents were not entitled to absolute official immunity under *Barr v. Matteo, supra,* for publishing and distributing a congressional report on the District of Columbia's school system. It is difficult to determine the exact basis for the Supreme Court's decision. At one point, the Supreme Court indicates that the publication of the report did not involve the exercise of discretion. 412 U.S. at 323, 93 S.Ct. 2018. At another point, the Supreme Court indicated that the Public Printer and the Superintendent of Documents were entitled to absolute official immunity only if the reports served legitimate legislative needs of Congress. 412 U.S. at 324, 93 S.Ct. 2018. Rather than invoke a "fixed, invariable rule" of absolute official immunity, the Court stated that a determination must be made whether "the contributions of immunity to effective government in particular contexts outweigh the perhaps recurring harm to individual citizens." 412 U.S. at 320, 93 S.Ct. at 2028.

■ In addition, a governor and other high state officers have no absolute official immunity from personal liability in an action under the Civil Rights Act of 1871 (42 U.S.C. § 1983). In such an action, the state officers have only a qualified immunity. *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

■ In determining whether Commissioners Huecker and Miller possessed absolute official immunity, we are presented with a question of state law. Although the decisions of the Supreme Court of the United States in this area are entitled to great respect, they are not binding on questions of state law. *Coleman v. Reamer's Ex'r,* 237 Ky. 603, 36 S.W.2d 22, 24 (1931). *Barr v. Matteo, supra,* has never been cited as authority by any Kentucky appellate court. The decision in *Spalding v. Vilas, supra,* has been cited with approval, but only in actions for defamation. *Ranson v. West,* 125 Ky. 457, 101 S.W. 885 (1907); *Tanner v. Stevenson,* 138 Ky. 578, 128 S.W. 878, 30 L.R.A.,N.S., 200 (1910); *McAlister & Co. v. Jenkins,* 214 Ky. 802, 284 S.W. 88 (1926); *Begley v. Louisville Times Co.,* 272 Ky. 805, 115 S.W.2d 345 (1938).

There are a number of decisions in Kentucky holding that governmental officers may be personally liable for negligence or bad faith in performing *ministerial* duties. *Cottongim v. Stewart,* 283 Ky. 615, 142 S.W.2d 171 (1940); *Whitt v. Reed,* Ky., 239 S.W.2d 489, 32 A.L.R.2d 1160 (1951); *Upchurch v. Clinton Co.,* 330 S.W.2d 428 (Ky. 1959). Unfortunately, it is almost impossible to draw any clear and definite line between ministerial acts and discretionary acts. W. Prosser, *The Law of Torts,* at 990 (4th ed., 1971); compare the majority opinion with the dissenting opinion in *Shearer v. Hall,* Ky., 399 S.W.2d 701 (1965). If a governmental officer is not entitled to an absolute immunity from personal liability for his acts, he has been afforded a qualified immunity. In *Spillman v. Beauchamp,* Ky., 362 S.W.2d 33, 2 A.L.R.3d 814 (1962), the court held that an officer acting in good faith within the scope of his authority was not personally liable for damages sustained by a member of the public unless the officer acted negligently. See also *Moores v. Fayette Co.,* Ky., 418 S.W.2d 412 (1967).

In no Kentucky appellate decision has there been an explicit recognition of the doctrine of absolute official immunity. However, in those cases holding officers liable for ministerial acts, there was implicit recognition that the officer would not be

liable for the consequences of discretionary acts. In *J. F. Schneider & Son v. Watt,* Ky., 252 S.W.2d 898 (1952), the members of the Kentucky National Park Commission were held not liable for causing the United States to initiate an eminent domain proceeding against the plaintiff's property. The eminent domain proceeding was subsequently abandoned because the commission did not have sufficient funds to pay for the property. In holding that the commission members were not liable for damages to the landowner, the court stated:

> Having found that the appellees acted within the scope of their authority, we conclude that they also come within the general rule of law which absolves administrative agents of government of civil liability for their official acts.

*Id.* 252 S.W.2d at 901. No Kentucky case holds that a governmental officer can never be entitled to absolute immunity for acts performed within the scope of his official authority.

 There can be no single test for determining whether a public officer is immune from tort liability because he is engaged in the exercise of a discretionary function. Consequently, we adopt the approach taken by the *Restatement (Second) of Torts* § 895D(3) (Tentative Draft No. 19, 1973).[3] Under that section, the court must not only consider whether the particular activity should be characterized as a discretionary function, but the court must also determine the degree of immunity or privilege afforded the officer. If the officer is entitled to absolute immunity, he is not liable so long as he acts within the general scope of his authority. If the officer is entitled to only a limited or qualified immunity, the officer is not liable if he acts in good faith. Under other circumstances, the public officer is privileged so long as his actions are reasonable under the circumstances. See Comment *e* to § 895D.

 Placing Thompson's name on the re-employment list was a ministerial act, not involving a discretionary function. If Commissioner Miller had refused to place Thompson's name on the re-employment list following a written request by Thompson, there would have been no immunity from tort liability. See Comment *h* to § 895D. However, Commissioner Miller placed Thompson's name on the re-employment list prior to the time he made a written request. Consequently, there could be no liability to Thompson for breach of this ministerial duty.

 The only other basis for liability would be the failure of Huecker to employ Thompson in another position within the Department of Economic Security under the reorganization plan. After considering the factors set forth in Comment *f* to § 895D, we conclude that re-employment of Thompson required the exercise of a discretionary function entitling Huecker to absolute immunity. Commissioner Huecker was operating at the highest level of state government, exercising important policymaking functions. Thompson was an upper echelon officer who was required to exercise a discretionary function in carrying out policy. For a court to review Huecker's decision not to appoint Thompson as Deputy Commissioner for the Office of Staff Services would require the court to pass judgment on conduct at the highest level of a coordinate branch of government. Another remedy was available to Thompson. He could have requested in writing that his name be placed upon the re-employment list upon receipt of the letter from Huecker terminating his employment as Chief Personnel Officer. Then, he could have appealed to the personnel board if he had been refused employment in an available position for which he was qualified. To impose tort liability would discourage public officers from undertaking plans to improve the effi-

---

**3.** (3) A public officer acting within the general scope of his authority is not subject to tort liability for an administrative act or omission if

 (a) He is immune because engaged in the exercise of a discretionary function

 (b) He is privileged and does not exceed or abuse the privilege, or

 (c) He is not negligent because he acted as a reasonable prudent person in the exercise of his discretion.

ciency of government. Also the decisions of the personnel board might be affected if the board believed that an adverse decision might subject the supervisory officer to personal tort liability. Cf. *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 993, 47 L.Ed.2d 128 (1976).

The conflicting policies involved in granting absolute immunity to public officers were perhaps best expressed by Judge Learned Hand in *Gregoire v. Biddle,* 177 F.2d 579, 581 (2d Cir., 1949):

It does go without saying that an official, who is in fact guilty of using his powers to vent his spleen upon other, or for any other personal motive not connected with the public good, should not escape liability for the injuries he may so cause; and, if it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to satisfy a jury of his good faith. There must indeed be means of punishing public officers who have been truant to their duties but that is quite another matter from exposing such as have been honestly mistaken to suit by anyone who has suffered from their errors. As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation.

Judge Hand's reasoning is applicable to the facts in this case.

*Ruling*

The circuit court did not err in dismissing Thompson's complaint against Commissioners Huecker and Miller.

### HOLDING

The judgment of the circuit is affirmed.

All concur.