Charlotte STEWART, et al., Plaintiffs,

v.

The PANTRY, INC., et al., Defendants.

Civ. A. No. 86–0004–O(CS).

United States District Court,
W.D. Kentucky,
Owensboro Division.

Dec. 7, 1988.

Lucius P. Hawes, Jr., Wright & Hawes, Hopkinsville, Ky., for plaintiffs.

Daniel N. Thomas, Thomas & Ison, Hopkinsville, Ky., Maubert R. Mills, Mills, Mitchell and Turner, Madisonville, Ky., Donald B. Harden, John E. Thompson, Fisher & Phillips, Atlanta, Ga., for The Pantry, Inc.

Robert Vic Bowers, Jr., Bennett, Bowman, Triplett & Vittitow, Owensboro, Ky., for Jess L. June, Jesse M. June and Fidelity Search, Inc.

## MEMORANDUM OPINION

SIMPSON, District Judge.

This matter is before the Court on summary judgment motions by the defendants, The Pantry, Inc. ("The Pantry"), Jess and Jesse June ("the Junes"), and Fidelity Search, Inc. ("Fidelity Search"). It is a diversity case which arose from plaintiffs' dismissal from their employment as assistant managers at separate stores operated by The Pantry.

## PARTIES

The Pantry is a North Carolina corporation which operates convenience-type stores in Kentucky and elsewhere. Fidelity Search is an Indiana corporation engaged in providing polygraph services to customers. The Pantry contracted with A. Madley Corp., not a party to this litigation, for polygraph examinations of its employees. A. Madley Corp. in turn subcontracted the work out to Fidelity Search. (Answers to Interrogatories, filed by the Junes and Fidelity Search 4/29/86.) The Junes are Tennessee citizens and are employees of Fidelity Search.

On September 10 and 11, 1985, the Junes administered polygraph examinations to employees of The Pantry including the plaintiffs, Wanda Garrett ("Garrett") and Erma Lile ("Lile"). The polygraph results for both Garrett and Lile, as interpreted by the Junes, showed "deception indicated", results which the Junes communicated to The Pantry management. As a result of the polygraph examinations, Garrett and Lile were both terminated from their positions as assistant managers with The Pantry.[1]

## PROCEDURAL HISTORY

In the original Complaint, plaintiffs asserted claims for wrongful discharge against The Pantry, defamation against all defendants, and negligence against the Junes. In the First Amended and Supplemental Complaint, plaintiffs further alleged invasion of privacy against all defendants,[2] and added Fidelity Search as a defendant, on the theory that the Junes' liability should be imputed to Fidelity Search. Subsequently, by way of the Second Amended and Supplemental Complaint, plaintiffs moved to further amend their complaint to state a claim for infliction of severe emotional distress. While the plaintiffs' motion regarding their claim for infliction of severe emotional distress was pending, The Pantry moved for summary judgment on each claim raised by the plaintiffs. Although the motion to amend had not been granted at the time The Pantry

---

1. A third employee, Charlotte Stewart, was originally a plaintiff in this action, but she was voluntarily dismissed on her own motion.

2. Plaintiffs characterized Paragraph 1 of the First Amended and Supplemental Complaint as *"Bad Faith* and Invasion of Privacy ..." In view of recent Kentucky authority limiting "bad faith" claims in the context of insurance contracts, where the "tort" was first recognized, *see* *Federal Kemper Ins. Co. v. Hornback,* 711 S.W. 2d 844 (Ky.1986), this Court agrees with defendants that the First Amended and Supplemental Complaint fails to state a claim for "bad faith" upon which relief can be granted, in the context of terminable-at-will employment. Accordingly, plaintiffs' "bad faith" claim will be dismissed, pursuant to Federal Rule of Civil Procedure 12(b)(6).

moved for summary judgment, The Pantry prophylactically included in its motion for summary judgment the issue of infliction of severe emotional distress, as well as the issues raised in the earlier pleadings. Afterwards, the Court granted the plaintiffs' motion to amend and the Second Amended and Supplemental Complaint was ordered filed. In response to The Pantry's summary judgment motion, plaintiffs submitted "Plaintiffs' Memorandum of Response and Reply to Documents Filed by The Pantry, Inc." (hereinafter Opposing Memorandum), addressing each of the issues The Pantry raised. The Junes and Fidelity Search then moved for summary judgment on substantially the same issues raised by The Pantry. Plaintiffs filed no Opposing Memorandum to the Junes' separate motion for summary judgment. Nevertheless, because the issues raised by all defendants' motions were substantially identical, this Court considers plaintiffs' Opposing Memorandum to be a response to all defendants' motions. Plaintiffs have also moved for summary judgment, but this Memorandum Opinion disposes of issues plaintiffs have raised as well. Accordingly, plaintiffs' motion must be denied.

### FACTS

The facts summarized in this Memorandum Opinion are gleaned from the pleadings, answers to interrogatories and the depositions of plaintiffs. Because this case stands submitted on defendants' motions for summary judgment, this Court has considered these facts in the light most favorable to plaintiffs, resolving inferences in favor of plaintiffs, as it must. *Matsushita Electric Industrial Co., Ltd., et al v. Zenith Radio Corp., et al*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Lile had worked for The Pantry for approximately three and a half years at the time of her dismissal. During that three-and-a-half year period, she had taken approximately six or seven polygraphy examinations. (Lile depo. at 13). Garrett had been employed by The Pantry for about seven years at the time of her dismissal. During that period, she had taken approximately fifteen polygraph examinations. (Garrett depo. at 31–32). From the outset of their employment with The Pantry, both plaintiffs understood that periodic polygraph examinations would be required as a condition of their employment. (Garrett depo. at 35; Lile depo. at 12, 47). On the date they took the polygraph examinations which resulted in their termination, both plaintiffs signed releases, as they had on previous occasions, in which they voluntarily consented to the test itself, as well as to the release of the results to employees of The Pantry. Specifically, on September 10, 1985, Garrett signed a "Fidelity Search, Inc. Polygraph Release and Consent Waiver" and an "Authorization". After the results of the first polygraph examination showed "deception indicated", The Pantry offered to administer Garrett a second examination, which she agreed to take. One day after she "failed" the first test, she took the second examination, once again signing the "Fidelity Search, Inc. Polygraph Release and Consent Waiver" and an "Authorization".[3] The result of this polygraph was also "deception indicated". Garrett was terminated as a result. In Lile's case, the release she signed consisted of a "Polygraph Examination Agreement" and an "Authorization". Although Lile was also offered an opportunity to take a second polygraph examination, she declined to do so. Copies of the documents plaintiffs signed are attached to this Memorandum Opinion as an appendix.

### I. WRONGFUL DISCHARGE

Plaintiffs have asserted a claim for wrongful discharge against The Pantry. The Pantry moved for summary judgment on that claim. In response to The Pantry's motion for summary judgment, plaintiffs state simply that "Kentucky's law of wrongful discharge is not an effective safe-

---

**3.** On the second day, after the test was concluded, Garrett refused to sign the acknowledgement that she was well-treated and submitted to the test of her own free will. Garrett stated that the polygraph examiner's tone of voice was "cruel" and that she considered his questions and comments "overbearing". (Garrett depo. at 44–45).

guard against abusive use of polygraphy in the work place." (Opposing Memorandum at 10). Plaintiffs are correct. This Court sees no basis for a wrongful discharge claim in the facts of this case.

The case of *Grzyb v. Evans*, 700 S.W.2d 399 (Ky.1985), explains that terminable-at-will employees, as plaintiffs in this action were, have a claim for wrongful discharge only when two conditions exist:

> (1) The discharge must be contrary to a fundamental and well defined public policy as evidenced by existing law. (2) That policy must be evidenced by a constitutional or statutory provision.

*Grzyb* at 401.

If plaintiffs' discharge does not meet these criteria, it is not a basis for a wrongful discharge claim, no matter how "morally indefensible" the employer's reasons. *Firestone Textile Co. Div., Firestone Tire & Rubber Co. v. Meadows*, 666 S.W.2d 730, 731 (Ky.1984). Whether the "policy" which forms the basis for plaintiffs' claims in the case rises to the level that *Grzyb* requires is a question of law for the Court. *Grzyb* at 401.

In the present case, plaintiffs' claim that The Pantry's reliance on polygraph results to dismiss them, and the very use of polygraphs to screen employees, was an "unreasonable practice". However, plaintiffs point to no constitutional or statutory provision in Kentucky law limiting the use of polygraphs or their results in employment decisions, and this Court finds no such law.[4] As a matter of law then, and in accordance with the limitations imposed by *Grzyb*, even if there were some policy prohibiting employers' use of polygraph tests, it would not create a claim for wrongful discharge, because it is not "evidenced by existing law" in the form of a statute or constitution. Plaintiffs' reliance on the case of *Douthitt v. Kentucky Unemploy-*

*ment Ins. Comm.*, 676 S.W.2d 472 (Ky. App.1984), is therefore misplaced. Until state or federal laws or constitutions are amended to articulate such a public policy, the use of polygraphs does not create a claim for wrongful discharge under Kentucky law. Accordingly, as a matter of law, The Pantry's motion for summary judgment on this issue must be granted, and plaintiffs' wrongful discharge claim against The Pantry must be dismissed.[5]

## II. INFLICTION OF SEVERE EMOTIONAL DISTRESS

■ As explained in Section I, supra, as terminable-at-will employees, plaintiffs could be discharged for any reason or for no reason at all. Even if the rationale for their firing was morally indefensible, plaintiffs do not have a claim for wrongful discharge. This Court notes that where the dismissal itself was a proper exercise of The Pantry's legal right, the discharge, of itself, cannot constitute intentional infliction of emotional distress. The well-recognized right of an employer to discharge terminable-at-will employees would otherwise be impermissibly restricted. *Cf. Firestone Textile Co. Div.* at 733 ("Employers ... have a legitimate interest to protect" which requires that "the cause of action for wrongful discharge [be] clearly defined and suitably controlled". *Id.*, quoted in *Grzyb* at 401). Thus, as a matter of law, the dismissal does not constitute extreme or outrageous conduct. Because the dismissal itself creates no cause of action, the inquiry as to whether the facts of this case support a claim for intentional infliction of emotional distress must focus on the use of the polygraph.

The criteria for establishing a claim for intentional infliction of emotional distress, as the tort is called in Kentucky's courts, are stringent: The conduct complained of

---

**4.** Kentucky's statutes mention polygraphy in only one context. Chapter 329 of the Kentucky Revised Statutes regulates the qualification and licensing of "detection of deception examiners".

**5.** We are mindful of the Kentucky Supreme Court's prohibition against reliance on unpublished opinions as authority. We have read

with interest the Kentucky Court of Appeals opinion in *Brown v. Kay Jewelers*, 85–CA–3046–MR, slip opinion at 4 (December 5, 1986), which plaintiffs have provided. While we do not rely on it as authority, we are persuaded that it is a correct view of Kentucky law, and adopt its logic here.

must be extreme and outrageous, i.e., a "deviation from all reasonable bounds of decency", "utterly intolerable in a civilized community". The conduct must consist of *"harassment intended* to cause *extreme* emotional distress". *Craft v. Rice,* 671 S.W.2d 247 (Ky.1984), adopting *Restatement of Torts (2d)* § 46. (Emphasis supplied). Under Comment (h) to § 46 of the *Restatement,* the initial question as to whether the conduct complained of is sufficiently outrageous and extreme to support recovery is for the Court.[6]

The facts of the present case, even when viewed in the light plaintiffs urge, might establish that the purpose of dismissing employees on the basis of polygraph results "is to impress upon employees ... that if they engage in ... theft, The Pantry and its hired polygraphers will discover such activities and they will be disgraced." (Second Amended and Supplemental Complaint at para. 4). The facts might also show that The Pantry dismissed employees at random, based on polygraph results, to set an example to others, despite the fact that The Pantry allegedly knew or should have known that the polygraph is "a useless diviner of truth". The Pantry's alleged purpose in using the polygraph in such a fashion is to "sacrifice" some employees to dissuade others from stealing. (Plaintiffs' Opposing Memorandum at 14). Further, claim plaintiffs, expert testimony may show that polygraphy is promoted to employers as a means of "employee control". *Id.* at 15.

Nevertheless, even if all of the plaintiffs' factual allegations and reasonable inferences concerning The Pantry's purpose in using the polygraph are taken as true, as a matter of law, The Pantry's use of the polygraph examination does not amount to extreme or outrageous conduct under the circumstances of this case. The fact that Kentucky licenses polygraph examiners to engage in the very conduct of which plaintiffs complain defeats any claim that reliance on polygraph results is "utterly intolerable". *Compare Moniodis v. Cook,* 64 Md.App. 1, 494 A.2d 212 (1985) (use of polygraph was prohibited by Maryland law; employer transferred employee for refusing to submit to examination in effort to force her to resign). Although there may be skeptics as to the value of polygraph testing as a means of assessing the truthfulness of the person being examined, nothing in Kentucky law establishes its use to attempt to detect and discourage employee dishonesty is an utterly intolerable "deviation from all reasonable bounds of decency". To the contrary, regulation and licensing by the State of the practice of polygraphy counsels otherwise. Merely because some believe polygraphy to be unreliable, thus precluding introduction as evidence at trial, the mere use of polygraphy does not constitute extreme or outrageous conduct. *Cf. Douthitt v. Kentucky Unemployment Ins. Comm.,* 676 S.W.2d 472 (Ky.App.1984). Moreover, its use as a means of "employee control" is no more "harassment intended to cause extreme emotional distress" than other methods which might be used to discourage employee dishonesty. Any emotional distress stemming from the threat of being fired existed whether The Pantry used polygraph screening or not. The use of the polygraph simply cannot elevate a groundless wrongful discharge claim to one for outrage. *Accord Gibson v. Hummel,* 688 S.W.2d 4, 8 (Mo.App.1985). Plaintiffs' claims of infliction of severe emotional distress must therefore be dismissed.

---

**6.** *Court and jury.* "It is for the Court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so. Where reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case the conduct has been sufficiently extreme and outrageous to result in liability." *Restatement of Torts (Second)* § 46, Comment h. Thus, as is the case when considering a motion for summary judgment, only if there are facts from which it can reasonably be inferred that the requisite elements for the claim exist, the case must go to the jury and summary judgment must be denied. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Chrysler Workers Association v. Chrysler Corp.,* 834 F.2d 573 (6th Cir.1987); *Boddy v. Dean,* 821 F.2d 346 (6th Cir.1987). Otherwise summary judgment is proper.

## III. DEFAMATION

In the present case, plaintiffs' claim that the defendants published defamatory information has two distinct aspects. First, plaintiffs contend that communication of the results of the polygraph examination by the Junes and Fidelity Search to plaintiffs' supervisors at The Pantry constitutes a "publication". Second, plaintiffs claim that The Pantry "published" defamatory information about plaintiffs by passing the reports among The Pantry management to the "Risk Management Department" and to plaintiffs' supervisors.

The critical elements for a case of defamation are (1) defamatory language, (2) about the plaintiff (3) which is published and (4) which causes injury to reputation. *Columbia Sussex Corp., Inc. v. Hay*, 627 S.W.2d 270 (Ky.App.1982). "Defamatory language" is language which "tends to (1) bring a person into public hatred, contempt or ridicule; (2) cause him to be shunned or avoided; or, (3) injure him in his business or occupation." *McCall v. Courier–Journal & Louisville Times*, 623 S.W.2d 882, 884 (Ky.1981).

The only language on which the plaintiffs' claims against the Junes can possibly be based is contained in "Confidential Polygraph Reports" generated as a result of the polygraph examinations. It was these reports, along with the releases and the charts of plaintiffs' responses, which the Junes communicated to The Pantry. (Answers of the Junes to interrogatories and request for production 4/29/86). The only language in either of plaintiffs' reports that carries any defamatory suggestion is the paragraph entitled "Test Results Charts I and II". In both plaintiffs' cases, these paragraphs state: "Examinee manifested physiological responses in the test indicating deception to [certain] questions ..."

■ Assuming, arguendo, that an expression of such an opinion as to how plaintiffs' physiological responses should be interpreted constitutes defamatory language, the Junes had a contractual duty to The Pantry to communicate the results. Where such a legal duty exists, the communication is protected by a qualified privilege. *Tucker v. Kilgore*, 388 S.W.2d 112, 114 (Ky. 1965) ("A publication is ... qualifiedly privileged where circumstances exist ... cast[ing] on [defendant] the duty of making a communication to a certain other person...." The duty may be "public, personal or private, either legal, judicial, political, moral or social...."). As discussed *infra*, there is no evidence of malice on the part of the Junes to defeat that privilege. Additionally, and more importantly, plaintiffs cannot escape the fact that they expressly consented to the communication they complain of. The basis for the Junes' "consent" defense, before this Court on the Junes' motion for summary judgment, is primarily the "Polygraph Examination Agreement" and "Authorization" that Lile signed, and on the twö separate "Polygraph Release and Consent Waivers" and two "authorizations" that Garrett signed. Those releases, attached hereto as an appendix, unequivocally defeat plaintiffs' defamation claim against the Junes.

■ Plaintiffs do not dispute that they understood and signed the releases, but they argue that the consents were not voluntarily given, because they were motivated by the fear that they would lose their jobs. While it may be true that plaintiffs feared they would be fired if they did not sign the consent forms, the fact remains that plaintiffs' employment was terminable at will. Thus, the "coercion" that plaintiffs argue vitiates their consent is nothing more than the threat that The Pantry would exercise its legal right to dismiss them, with or without cause. That does not constitute duress which would invalidate the consent. *See e.g., Redmon v. McDaniel*, 540 S.W.2d 870, 872 (Ky.1976) (voluntary resignation was waiver of right to hearing, even though obtained under threat of dismissal; it is not duress "to threaten to do what one has a legal right to do."). *And see Columbia Sussex Corp., Inc. v. Hay*, 627 S.W.2d 270, 277–78 (Ky.App.1982) (submission to polygraph not coerced by threat of dismissal).

■ Moreover, plaintiffs understood from the outset of their employment that

polygraphs would be required, and voluntarily undertook to comply with this condition. (*Compare Douthitt, supra,* in which the polygraph policy was initiated *after* the plaintiff began her employment.) The language of the releases plaintiffs signed demonstrates that they were on notice that the Junes and Fidelity Search would transmit the results to The Pantry. Plaintiffs admitted that they knew and understood that unfavorable results could be grounds for dismissal. Signing those releases, and submitting to the polygraph tests, with full knowledge of the consequences which might follow any unfavorable polygraph result, is valid consent to publication of those results. *Compare Polsky v. Radio Shack,* 666 F.2d 824 (3rd Cir.1981) (where use of polygraph as a condition of employment was prohibited by Pennsylvania law, consent given under threat of dismissal contravened public policy and was no defense). Where there is no legal prohibition against use of the polygraph, or public policy prohibiting dismissal of plaintiffs from their jobs for failing it, there are no facts in dispute which would warrant a finding that the consent was impermissibly coerced. The motion for summary judgment by the Junes and Fidelity Search on the defamation count must therefore be granted.

The Pantry also moved for summary judgment on plaintiffs' defamation claim, arguing that its internal communications were qualifiedly privileged because they constituted intra-corporate communications necessary to the company's operation. *Caslin v. General Electric,* 608 S.W.2d 69 (Ky.App.1980).

■ The only communications within the corporate hierarchy on which plaintiffs' claims are based are communications to the "Risk Management Department" and to plaintiffs' direct supervisors, including acting Division Manager, Paul Roberts. It was Mr. Roberts who informed plaintiffs of their terminations, based on the polygraph results. There is no evidence that The Pantry communicated the results of the polygraph examinations to plaintiffs' coworkers or to any nonmanagerial or non-supervisory personnel. Just as good-faith expressions of suspicions within the company, which are necessary to its proper function and which are made as confidentially as circumstances permit, are not actionable, *Dossett v. New York Mining & Manufacturing Co.,* 451 S.W.2d 843, 846 (Ky. 1970), without some showing of malice, communications to plaintiffs' superiors of the reason for their terminations through the "chain of command" are protected by a qualified privilege. It is inconceivable to think that the managers charged with responsibility for informing plaintiffs of their dismissal would not be entitled to learn and communicate to plaintiffs the reasons why. Likewise, the very nature of the responsibility of the "Risk Management Department" requires that it be informed of polygraph results which create the suspicion of wrongdoing. That these communications within the corporation are "necessary to its proper function" goes without saying. The communications are therefore qualifiedly privileged, as a matter of law. *Caslin* at 71.

■ The qualified privilege can be defeated by a showing of actual malice or abuse of the information. *See generally Tucker v. Kilgore,* 388 S.W.2d 112, 114–15 (Ky.1965). "Actual malice" exists where there is "ill will, hatred, or wrongful motive". *Holdaway Drugs, Inc. v. Braden,* 582 S.W.2d 646, 649–50 (Ky.1979). Once the qualified privilege is found to exist as a matter of law, the plaintiffs must come forward with facts to demonstrate actual malice or abuse. *Tucker v. Kilgore, supra; Holdaway Drugs, Inc. v. Braden,* at 649. Without designation of specific facts in the record which would constitute proof of actual malice by the plaintiffs, who bear the burden of proof on that issue, summary judgment in defendants' favor is proper. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). In the present case, plaintiffs point to no evidence whatsoever of actual malice or abuse by The Pantry in its intra-corporate communications of the polygraph results. The qualified privilege is not defeated by the mere fact that the communication was of polygraph results, because, despite the

plaintiffs' suggestion to the contrary, reliance on polygraphs does not constitute ill will, hatred or wrongful motive by The Pantry. Accordingly, plaintiffs cannot defeat the qualified privilege the facts show is warranted in this case. *Caslin* at 71; *Wyant v. SCM Corp.*, 692 S.W.2d 814, 815 (Ky.App.1985).

■ Finally, although The Pantry did not argue consent in support of its own motion for summary judgment, it is clear from the releases Garrett and Lile signed, and from their admitted understanding of the conditions of their employment, that they consented to have polygraph results communicated within the corporation. That consent was not conditioned on the polygraph results being favorable or unfavorable; plaintiffs knew that unfavorable results could result in termination and must have known that unfavorable results would be communicated within The Pantry's corporate hierarchy. Accordingly, because the consent to the polygraph examinations, and to the use of the results, was voluntarily given, plaintiffs' defamation claim against The Pantry must fail. The Pantry's motion for summary judgment on the defamation claim will, therefore, be granted.

## IV. INVASION OF PRIVACY

■ Plaintiffs claim that their privacy was invaded in two ways. First plaintiffs characterize the measurement of their heart rate, respiration rate, and the electrical impulses and secretions of their hands as "intentional and reckless intrusions upon the privacy of their persons and upon the bodily functions of their persons." (First Amended and Supplemental Complaint at 4). Invasion of privacy protects one from intrusions into one's seclusion, not one's person. *Restatement (Second) of Torts* § 652. Moreover, this type of allegedly offensive touching is in the nature of battery, not invasion of privacy. However, whatever the conduct is called, consent to that measurement is a complete defense. As discussed previously, no facts exist from which it can be inferred that the plaintiffs did not voluntarily and knowingly

consent to these measurements. Accordingly, defendants are entitled to summary judgment on this aspect of the invasion of privacy claim.

■ Second, plaintiffs complain that their dismissal under the circumstances of this case placed them "in a false light ... under circumstances where widespread publication within and outside the class of persons who are employees of The Pantry, Inc., can be expected ..." (First Amended and Supplemental Complaint at 3).

In the Opposing Memorandum, plaintiffs explain the basis for their claim. They were:

> suddenly fired from their jobs in a very small town, immediately after they and every other employee in their stores, all residents of the same town, were required by The Pantry to submit to polygraph tests ... [W]hen people asked [plaintiffs] why [they were fired], they said "they say I failed my polygraph test."

Plaintiffs' Memorandum at 11.

Lile admits that *she herself* told fellow employees and others of the reason for her termination:

> A. That afternoon after he said I failed it, I told the girl that I worked with when I stopped in the store. I said, "He said I failed my polygraph."

> \* \* \* \* \* \*

> Q62 Whenever you talked to people and they inquired as to your termination, what reason did you give them as to why you had been terminated?
> A. If they keep pushing it, and it's somebody you know, you tell them that they said you failed your polygraph.

Lile depo. at 56–57. Lile also acknowledged that The Pantry instructed her not to tell the reasons that another employee was terminated and that employees were sometimes terminated for reasons other than unfavorable polygraph results. *Id.* at 57–58.

In her deposition, Garrett stated:

> Q48 Did you tell anybody that you had been terminated because you had "failed your test"?

A. Where I file [sic] my applications out.

Q49 I mean like personal friends or somebody?

A. And they want to know why I'm not working?

Q50 Yeah, along that line.

A. I say "Well, I was fired." "Why were you fired?"

Q51 And I suppose whenever you apply for jobs at other places that you have to put it down on the applications or is that volunteered by you?

A. If you've filled an application out, you know that they want to why [sic]. What am I going to do, lie to them?

In *McCall v. Courier–Journal & Louisville Times*, 623 S.W.2d 882 (Ky.1981), Kentucky's Supreme Court adopted § 652A of the *Restatement (Second) of Torts*. That section states the following general principle:

(1) One who invades the right of privacy of another is subject to liability for the resulting harm to the interests of the other.

(2) The right of privacy is invaded by

(a) unreasonable intrusion upon the seclusion of another . . .; or

(b) appropriation of the other's name or likeness . . .; or

(c) unreasonable publicity given to the other's private life . . .; or

(d) *publicity that unreasonably places the other in a false light before the public.* . . .

Thus, in order to prevail on a false-light claim, the plaintiffs must prove:

(1) publicity by the defendant (2) which is unreasonable, and (3) which "attributes to [plaintiff] characteristics, conduct or beliefs that are false and that he is placed *before the public* in a false position."

*McCall* at 888, n. 9, citing comment b to *Restatement (Second) of Torts*, § 652E (1976)

Defendants claim that an employee has no right to privacy regarding "employment activities that could be raised in a legitimate internal investigation regarding possible employee theft". This position is akin to the "qualified privilege" applicable to intra-corporate communications in the defamation context. We need not reach the issue of whether The Pantry's conduct was privileged in the false-light context, i.e., "reasonable", for we conclude that there was no "publicity" of the type necessary for a false-light claim.

First, the *Restatement* makes clear the requirement that the publicity must put plaintiffs in a false light *before the public*. *Id.* Unlike a defamation claim, which can be based on a single communication to one individual, the essence of a false-light claim is that it results in creation of a false public image of the plaintiff. *Id.*

Second, the false public image must result from an unreasonable *publicity* by the *defendant*. "*Publicity*", in the false-light context, requires more than the mere act of firing plaintiffs under circumstances which may result in gossip. (We reiterate that there was no evidence that The Pantry or the Junes communicated the polygraph results to third parties.) Rather, it requires the communication of the false impression that plaintiffs were dishonest employees, with knowing or reckless disregard for the falsity of the publicized matter. *McCall* at 888. For that to occur in the present case, plaintiffs must be able to show that The Pantry communicated *the reasons* for plaintiffs' termination to members of the public. There is no evidence to sustain such a contention. Moreover, even if there were evidence that The Pantry communicated such information outside the corporate hierarchy, given that plaintiffs also told others of the reason for their termination, any false light created is not attributable to any conduct on the part of The Pantry.

Most importantly, plaintiffs entire false-light claim rests upon The Pantry's alleged "policy" of terminating employees "under circumstances where widespread publication . . . can be expected, and is in fact desired and intended. . . ." Beyond these contentions, plaintiffs have neither pleaded nor proved any "publicity" by The Pantry, other than the overt act of firing plaintiffs.

If the act itself can give right to a cause of action for false light, then any time an employer discharges an employee, the employer runs the risk that the accompanying stigma will result in a false-light lawsuit. That risk may be exacerbated where the events occur in a small town, where plaintiffs may be well known and news spreads quickly. False-light liability must be limited only to those cases in which the employer unreasonably communicates to the public false reasons for a dismissal, not the mere fact of dismissal. Otherwise the terminable-at-will employment doctrine is unreasonably restricted. *Cf. Firestone Textile Co. Div.*, supra, at 733. Therefore, and because there are no facts in dispute which would allow plaintiffs to recover on a false-light claim, The Pantry is entitled to summary judgment on this claim.

## V. NEGLIGENCE

All defendants moved for summary judgment in their favor on plaintiffs' claims that the polygraph examinations were negligently administered. In response to The Pantry's motion, plaintiffs cite neither facts nor legal authority. Plaintiffs merely acknowledge that "a simple negligence action is inappropriate for the complexities of this case, which better fit the torts of defamation, invasion of privacy, and intentional infliction emotional distress".

After plaintiffs responded to The Pantry's motion, apparently abandoning their negligence claim, the Junes and Fidelity Search moved separately for a summary judgment ruling that they were not negligent in administering the polygraph tests in question. Plaintiffs made no separate response to the motion by the Junes and Fidelity Search.

Normally, the issue of whether the Junes were negligent in administering the examinations could present material issues of fact precluding summary judgment on this issue. However, in view of plaintiffs' apparently abandonment of their negligence claim, and of the absence of any response to the Junes' motion, Rule 6(b)(1)(A) of the Joint Local Rules for the United States District Courts of the Eastern and Western Districts of Kentucky, as well as Federal Rule of Civil Procedure 56(e), allow this Court to grant defendants summary judgment on the negligence issue. Because the negligence claim must be dismissed, this Court need not address the question of whether negligence on the part of the Junes can be imputed to The Pantry. If the Junes are entitled to summary judgment on the negligence claim, then so is The Pantry.

A separate order in accordance with this Memorandum Opinion will be entered.

# APPENDIX

## POLYGRAPH EXAMINATION AGREEMENT

PLACE: _Dooman Ky_ DATE: _9.1.85_

I, _Emma E. Lile_ , do hereby voluntarily, without
duress, coercion, promise of reward and/or immunity, submit to a
polygraph examination, an interview and verification procedure utilizing
the polygraph. I have had the nature of this interview and polygraph
procedure explained to my complete satisfaction. I do hereby consent to
the placing of the necessary apparatus upon my person. I affirm that I
have no known health related problems that would prevent me from taking
said examination. I do hereby release Fidelity Search, Inc., the poly-
graph examiner administering the examination, and

_The Partnu INC 6P's_

from any and all claims resulting from and arising out of this examination
and do further authorize the release of the results of the examination,
any information I volunteer, and the examiner's opinion to those parties
having interest in same.

I have been informed that all specific question areas will be reviewed
with me before the polygraph testing and that I have the right to refuse
or accept the examination. I am not required to answer any questions or
give any information. Any information I volunteer and the examiner's
opinion may be used by the interested parties to evaluate my suitability
for employment or continued employment.

I have the right to halt or terminate the examination or interview at
any time and to leave this room at any time. I have the right to know,
upon request, the results of the examination. I am not waiving any of my
legal rights and I have the right to consult with an attorney before
agreeing to take the examination. I am advised the governing authority
for polygraph examiners licensed and practicing in the State of Tennessee
is the Tennessee Board of Control for Polygraph Examiners, 706 Church St.,
Suite 409, Doctors Building, Nashville, Tennessee, and the telephone
number is 615-741-0697.

_Emma E. Lile_ 4:16pm

**SIGNATURE OF PERSON TO BE EXAMINED TIME WITNESSED**

The examination was concluded at _5:14pm_ the above date. I completely
reaffirm in its entirety my above agreement. I also certify that during
the entire time I was well treated, submitted myself freely to the exam-
ination, knowing that I could stop anytime I so desired by merely saying
I wished to stop. I remained of my own free will knowing that I could
leave this room at any time I so desired, and that there were no threats,
promises or any harm whatsoever done to me during the entire period I
have been here, either in connection with the examination or my signing
of this agreement.

_Emma E. Lile_

**SIGNATURE OF PERSON EXAMINED WITNESSED**

1372

## A U T H O R·I Z A T I O N

I, _Erma E. Tile_ , do of my own free will and
without duress, voluntarily agree to be examined by the Polygraph (truth
verification) test.

I understand I am being polygraphed for "_Inventory Shortage_ ",
at the request of The Pantry, Inc.

I authorize the disclosure of the results and the Examiner's opinions, either
orally or in writing to The Pantry, Inc.

I also authorize the use of the required polygraph instrument attachments to
my person in order that the necessary recordings can be made.

Having fully consented to this examination, I hold free from all harm, liability
or damage to me as a result of the examination, The Pantry, its agents and
employees and all other persons designated by The Pantry, together with A.
Madley Corporation and any agents and employees of A. Madley Corporation and
I hereby remise, release, waive, and forever discharge all and each and
everyone of the above persons, firms, and corporations, their agents and
employees from any action or cause of action, claim or demand which I have
now or may ever have resulting from or by said examinations, or making
known as above, such reactions and opinions hereto.

This authorization is not intended to waive or restrict any employment related
rights conferred by any applicable federal or state statute.

I recognize that I have the right to refuse to answer any question in this
examination. I also understand I have the right to terminate this examination
any time I desire.

I have carefully read or have had read to me, all the aforegoing, and fully
understand all of its contents. With full knowledge and understanding of
the above, I sign this authorization freely and voluntarily.

_9-11-85_
Date

_Erma E. Tile_
Signature

_4:10_
Time

WITNESSED BEFORE ME THIS _11th_ DAY OF _Sat_ 19 _55_

AT _Pantry 116_ .

_____
Signature of Examiner

State Polygraph License # _TX-052_

## EXHIBIT 1

FIDELITY SEARCH, INC. POLYGRAPH RELEASE AND CONSENT WAIVER $5.9-67

I, _Wanda June Garrett_ do hereby voluntarily, without threat, promise of reward, or promise of immunity, submit to a Polygraph Examination on this _10th_ day of _Sep_ 19_85_ at _0905_ . I understand and agree that this examination is for the mutual benefit of myself and the requestor, _Pantry 723_ _____. I understand and agree that any and all information supplied by me, oral or written opinions of the Examiner and the results of this Examination will be supplied to the requestor to aid said requestor in making a determination regarding _Inventory Shortage_ . I further understand that signing this release does not deprive me of the right to refuse to answer any questions, or to terminate this examination at any time and leave without further questioning. I state that I have no health problems which would prevent me from taking this examination. I hereby forever release and hold harmless the requestor, _Pantry 723_ , FIDELITY SEARCH, INC., and the Examiner from any and all liability, claims or legal recourse arising as a result of this Examination.

_Jerre M. June_
**Witnessed**

_Xwasita D. Garrett_
**Signature of person to be tested**

This Examination was concluded at _9:32 AM_ on the above date. I completely reaffirm my above agreement in its entirety.

I also affirm that during the entire time I was well treated, submitted myself freely to this examination, knowing I could stop at any time I so desired by merely saying I wished to stop. I remained of my own free will, knowing I could leave this room at any time I wanted, and that there were no threat, promises or any harm whatsoever done to me during the entire period I have been here, either in connection with this examination or my again signing this agreement and release form.

_Wanda J. Garrett_

**Witnessed**

**Signature of Person Examined**

## AUTHORIZATION

I, *Wanda June Garrett* , do of my own free will and without duress, voluntarily agree to be examined by the Polygraph (truth verification) test.

I understand I am being polygraphed for "*Store 723 Inventory Shortage* ", at the request of The Pantry, Inc.

I authorize the disclosure of the results and the Examiner's opinions, either orally or in writing to The Pantry, Inc.

I also authorize the use of the required polygraph instrument attachments to my person in order that the necessary recordings can be made.

Having fully consented to this examination, I hold free from all harm, liability or damage to me as a result of the examination, The Pantry, its agents and employees and all other persons designated by The Pantry, together with A. Madley Corporation and any agents and employees of A. Madley Corporation and I hereby remise, release, waive, and forever discharge all and each and everyone of the above persons, firms, and corporations, their agents and employees from any action or cause of action, claim or demand which I have now or may ever have resulting from or by said examinations, or making known as above, such reactions and opinions hereto.

This authorization is not intended to waive or restrict any employment related rights conferred by any applicable federal or state statute.

I recognize that I have the right to refuse to answer any question in this examination. I also understand I have the right to terminate this examination any time I desire.

I have carefully read or have had read to me, all the aforegoing, and fully understand all of its contents. With full knowledge and understanding of the above, I sign this authorization freely and voluntarily.

9/10/85
Date

*Wanda J Garrett*
Signature

0903
Time

WITNESSED BEFORE ME THIS _11th_ DAY OF _Sep_ 19_85_

AT _Carter City, Ky_ . _Jess M. June_
Signature of Examiner

State Polygraph License # _____

EXHIBIT 2

A U T H O R I Z A T I O N

I, *Glenda J. Garrett* , do of my own free will and
without duress, voluntarily agree to be examined by the Polygraph (truth
verification) test.

I understand I am being polygraphed for " *Inv. shortage* "
at the request of The Pantry, Inc.

I authorize the disclosure of the results and the Examiner's opinions, either
orally or in writing to The Pantry, Inc.

I also authorize the use of the required polygraph instrument attachments to
my person in order that the necessary recordings can be made.

Having fully consented to this examination, I hold free from all harm, liability
or damage to me as a result of the examination, The Pantry, its agents and
employees and all other persons designated by The Pantry, together with A.
Madley Corporation and any agents and employees of A. Madley Corporation and
I hereby remise, release, waive, and forever discharge all and each and
everyone of the above persons, firms, and corporations, their agents and
employees from any action or cause of action, claim or demand which I have
now or may ever have resulting from or by said examinations, or making
known as above, such reactions and opinions hereto.

This authorization is not intended to waive or restrict any employment related
rights conferred by any applicable federal or state statute.

I recognize that I have the right to refuse to answer any question in this
examination. I also understand I have the right to terminate this examination
any time I desire.

I have carefully read or have had read to me, all the aforegoing, and fully
understand all of its contents. With full knowledge and understanding of
the above, I sign this authorization freely and voluntarily.

*9-11-85*
Date

*Wanda J Garrett*
Signature

*7.44*
Time

WITNESSED BEFORE ME THIS _____ *11th* _____ DAY OF _*Sept*_ _____ 19 *85*
AT _____ *Pantry 718* _____

Signature of Examiner

State Polygraph License # *TN-092*

FIDELITY SEARCH, INC. POLYGRAPH RELEASE AND CONSENT WAIVER *8.5-9-51*

I, _Wanda J. Hallett_ do hereby voluntarily, without threat, promise of reward, or promise of immunity, submit to a Polygraph Examination on this _11th_ day of _Sept_ 19 _85_ at _7.42_. I understand and agree that this examination is for the mutual benefit of myself and the requestor, _The Pony Tix_ _____. I understand and agree that any and all information supplied by me, oral or written opinions of the Examiner and the results of thi: Examination will be supplied to the requestor to aid said requestor in making a determination regarding _An Investop/he Jaye 727_. I further understand that signing this release does not deprive me of the right to refuse to answer any questions, or to terminate this examination at any time and leave without further questioning. I state that I have no health problems which would prevent me from taking this examination. I hereby forever release and hold harmless the requestor, _The Pony Tix_ _____, FIDELITY SEARCH, INC., and the Examiner from any and all liability, claims or legal recourse arising as a result of this Examination.

_____ _Wanda J. Hallett_
Witnessed Signature of person to be tested

 _7.45_
 Time

This Examination was concluded at _____ on the above date. I completely reaffirm my above agreement in its entirety.

I also affirm that during the entire time I was well treated, submitted myself freely to this examination, knowing I could stop at any time I so desired by merely saying I wished to stop. I remained of my own free will, knowing I could leave this room at any time I wanted, and that there were no threats, promises or any harm whatsoever done to me during the entire period I have been here, either in connection with this examination or my again signing this agreement and release form.

_____ _____
Witnessed Signature of Person Examined

FSI-0-5a
Rev. 2/84