## Meeks Motor Freight, Inc., v. Ham's Adm'r.

Nov. 16, 1945.

72

Harry B. Miller and Hunt, Bush & Lisle for appellant.

William L. Wallace for appellee.

OPINION OF THE COURT BY JUDGE LATIMER—Reversing.

The accident hereinafter detailed happened just out of the city limits of Lexington, Kentucky, where a built-up section consisting of a number of residences and small houses front on U. S. Highway 60 running between Lexington and Versailles. A Mr. Day conducted a grocery store fronting on the south side of the highway. To the west of Day's Grocery and beyond an alley or passway is a building known as Day's Motel. The passway between these two buildings is a private dead end driveway approximately 150 feet in length, 16 feet in width in the front portion, and 20 feet in width throughout the remainder. In the rear of the Motel, and on the same side of the driveway, is a garage. In the rear of Day's Grocery, and on the same side of the driveway, is a warehouse building in which the Serv-Us Dry Goods Company operates a wholesale dry goods business, Mr. C. M. Flynn being the owner and operator of the business.

On the day of the accident, which was July 3, 1942, the defendant, Meeks Motor Freight, Inc., was making a delivery of dry goods to the Serv-Us Dry Goods Company, Robert Stewart being the driver of the truck assigned to make the delivery, being assisted by a helper, J. W. Lawson. In order to reach the warehouse to make delivery it was necessary to use the private driveway. From the highway the driveway sloped sharply downward until it reached about the place of the garage situated behind the Motel. The rear of the Day Grocery building, because of the decline, was constructed several feet above the ground, being supported by wooden posts. The space under the building was unenclosed on the driveway side. James Flynn, a lad 11 years of age, son of C. M. Flynn, the owner of the Dry Goods Company,

had placed a stand under the rear of the Day Grocery where he was selling fireworks. He was tending this stand when the accident occurred.

Mr. and Mrs. John Ham, Sr., and their son, John, Jr., lived in a house just east of the grocery building and adjoining the Flynn home. The Flynns had two children—James, above mentioned, and Norris Lee Flynn, a boy then five or six years of age. Evidently the two Flynn boys and the little Ham boy were in the habit of and had for a number of months played in this driveway.

When Stewart drove his truck into the driveway he and Lawson both noticed a large paper box in the driveway ahead of them. The right front wheel of the truck passed over the paper box, at which time Jimmy Flynn, who was operating the fireworks stand, screamed to the driver that he had run over something. Stewart stopped the truck to make investigation and found that the little boy, John Ham, Jr. (Buddy), was in the box and had been run over with the wheel of the truck and was in a dying condition.

The testimony is that Buddy Ham and Norris Lee Flynn had been playing with and in the box on the driveway for sometime. They would take the box up on the incline of the driveway, crawl inside, and by motion of their bodies cause it to roll over until it reached level ground.

Action was brought by John Ham, Sr., as administrator of the estate of John Ham, Jr., against the Meeks Motor Freight, Inc., and Robert Stewart, the cause against Robert Stewart, however, having been dismissed, and obtained judgment in the Fayette Circuit Court in the sum of $10,000. For reversal of that judgment the Meeks Motor Freight, Inc., brings this appeal.

Appellant insists, first, that its motion for peremptory instruction made at the conclusion of plaintiff's testimony, and renewal thereof at the conclusion of all the testimony, should have been sustained because the evidence did not establish negligence on the part of the driver of the truck nor the violation by him of any duty to John Ham, Jr., and for the further reason that the injury to the boy in running over the box was purely an accident which could not have been anticipated nor fore-

seen by the driver of the truck. In disposing of this contention of the appellant it is necessary only to review a portion of the evidence pertinent to that question. Robert Stewart, the driver of the truck, when asked to describe the general layout of the premises stated as follows:

"Well, sir, as you go out Versailles Pike you turn off on a drive way that goes to the back of this Service Dry Goods. You go down off of Versailles Pike, and there is a steep incline as you leave the main road for about ten or fifteen—approximately fifteen feet from the road, and it's just a drop-off, then the grade is not so steep as you get farther on down, and in this drive way is just room enough to get a truck down in through there to make a delivery; and I entered the driveway and there was a pasteboard box in the driveway approximately five and a half or six feet long, approximately three or four foot square. I ran over the corner of this box and there was a boy sitting in under * * * don't know whether it is the corner of Day's Grocery * * * but there was posts, braces, holding the building up, and he was back up under there with some fireworks, and I was in extreme low, making about a mile an hour, what you would say gradually moving along—and immediately after, I just eased up over the box, this boy said I had run over something. I just stopped the truck immediately; I goes around and this box was still under the front wheel of this truck, I jerks this box corner out from under the truck wheel and tears the box open and this child was in the box. From there, God knows what happened because I didn't have sense enough to know nothin' then."

According to the driver's own testimony, there was a steep incline, or as he puts it "it's just a drop off, * * * just room enough to get a truck in down through there to make a delivery * * *" which within itself would be enough to require him to be cautious in driving through the alley. He stated that he saw the box in the driveway approximately 5½ or 6 feet long and approximately 3 or 4 feet square, and he located the box approximately 5 to 7 feet from the point where he turned off of the Versailles Highway. The helper, Lawson, indicated on a picture where the box was first lying when he saw it and stated in his deposition that it was anywhere from 8 to 10 or 12 feet from the sidewalk crossing

the entrance to the driveway. After so testifying Lawson visited the scene of the accident and made observation of the premises and came back for a correction of his former statement and stated that the mark on the picture indicated the location of the box was incorrect and placed it much farther down the driveway, and in his corrected deposition stated that at the point where the box was lying ranges between 35 and 40 feet from the sidewalk. Other testimony locates the point of the accident near the northeast corner of the garage building, a point 85 feet from the highway. The helper, Lawson, testified that he did see some motion at the end of the box. James Flynn testified that the box was moving when the truck ran over it. Little Norris Lee Flynn, about whose evidence there will be a discussion later because he was an unsworn child witness, testified that he was in the box with John Ham, Jr., and that they were moving or rolling the box at the time the truck ran over it, all of which under a proper lookout rule could have been seen or should have been seen by the driver of the truck under the exercise of ordinary care and proper lookout. The above, taken together with the evidence that the point of the accident was 3 feet from the corner of the garage, at which point the alley was 20 feet wide, and that the truck was only 6 feet and 8 inches wide at its widest portion, thereby presenting the additional question of the driver having ample room to pass without any necessity of driving over the box at all, leads us to conclude that there was sufficient evidence to submit the cause to the jury.

The appellant next contends that the court erred in giving Instruction 1 to the jury over its objection. The instruction given is as follows:

"The Court instructs the jury that it was the duty of the agent and servant of the defendant, Meeks Motor Freight, Incorporated, in charge of, and operating, the truck mentioned in the evidence in driving said truck on that occasion and through the alleyway mentioned in the evidence, to operate the truck in a careful manner, with regard for the safety and convenience of persons in said alleyway, and to maintain a reasonable lookout and exercise ordinary care to prevent said truck from colliding with any persons using said alleyway, and to have said truck under reasonable control so that he could, by the exercise of ordinary care, avoid its collid-

ing with any persons using said alleyway at the time and place mentioned in the evidence; and if the jury believe from the evidence in this case that on the occasion mentioned in the evidence, the agent and servant of the defendant, Meeks Motor Freight, Incorporated, then and there while in charge of, and operating, said defendant's truck in said alleyway, failed to exercise one or more of said duties, and that his failure, if any there was, contributed to cause or bring about the collision of said truck with John Ham, Jr., and that as a result thereof John Ham, Jr., was injured and died, then the law is for the plaintiff, and the jury should so find, and fix his damages as defined in Instruction No. II.

"Unless the jury so believe and find from the evidence in this case, then the law is for the defendant and the jury should so find."

Because of the gravity of the situation in which the driver of the truck was placed, and the resulting horrible accident, we shall endeavor a forthright analysis of the questions presented by the facts and circumstances of the case. It is obvious that there is more involved than merely the law of the road, and it becomes necessary to review some of the fundamental rules of negligence. It must be admitted that negligence, as a basis of civil liability, imports absence of care in performing an act or an omission or failure to do something that ought to have been done. To state it another way, there must be an existing duty, the breach of which results in an injury. The general and broad instruction above would no doubt suffice were we dealing with a matter that could reasonably have been anticipated by the driver of the truck. But here we are confronted with a specific something that does not fall within the realm of that which could reasonably have been anticipated. However, when confronted with a specific situation, as was the driver here, then it necessarily follows that there may have arisen some duty. In 38 Am. Jur., Sec. 14, under the subject of Negligence, the following is to be found:

"The rule of reasonable care under the circumstances could not limit the conduct of Robinson Crusoe as he was first situated; but as soon as he saw the tracks in the sand, the rule began to have vitality. He then had notice that there might be other persons on the island;

and this knowledge of their presence made it his duty as a reasonable man to use reasonable care to the end that no act of his should injure them.'' In the above statement, we find the underlying fundamental principle: the duty of a person to use care and his liability for negligence depends upon the tendency of his acts as they are known or should be known to him.

Under the same subject, 38 Am. Jur., Section 23, it is stated as follows:

''The foundation of liability for negligence is knowledge—or what is deemed in law to be the same thing: opportunity by the exercise of reasonable diligence to acquire knowledge—of the peril which subsequently results in injury.''

It cannot be denied, in fact the driver of the truck and his helper both admitted that they saw the box—a rather large box—and under the circumstances of the evidence as stated above there was opportunity to acquire knowledge and not pursue voluntary ignorance as to the contents of the box.

In 38 Am. Jur., Section 24 of the same subject above, these words are found:

''Every person is under a duty to exercise his senses and intelligence in his actions in order to avoid injury to others, and where a situation suggests investigation and inspection in order that its dangers may fully appear, the duty to make such investigation and inspection is imposed by law. * * * One under duty to use care for which knowledge is necessary cannot escape liability for negligence because of voluntary ignorance. * * *

''Liability for negligence may be predicated upon the lack of foresight or of forethought which is exhibited where one remains in voluntary ignorance of facts respecting the danger inherent in the particular act or instrumentality involved, concerning which a reasonably prudent person would become advised, on the theory that such ignorance is the equivalent of negligence.''

In Section 25 of the same subject, it is stated:

''Knowledge or the opportunity to acquire knowledge of the peril involved in an act is fundamentally the basis of the duty to use due care to avoid injury to another person.''

Since, as stated above, there is involved herein more than the ordinary law of the road, we conclude that there should have been limitation in the instruction above, which in substance should have stated that the defendant, after having discovered the box in the drive-way, or by the exercise of ordinary care and maintenance of a reasonable lookout, should have discovered the box; and further, after having seen the box, or by the exercise of ordinary care in maintaining a reasonable lookout, did discover, or ought to have discovered that there was some motion of the box as would place upon him the duty to exercise his sense and intelligence, and place upon him the duty to investigate and inspect in order that its dangers may fully appear, ·and fails to exercise ordinary care therein, and such failure, if any, was the proximate cause of the death of John Ham, Jr., the law is for the plaintiff.

The appellant further contends that the court erred in permitting Norris Lee Flynn, an infant between 7 and 8 years of age at the time of the trial, to testify first, because of his youth, immaturity, and incapacity of understanding his obligation and the nature and effect of an oath, had one been administered unto him; and second, because he was not sworn. The rule as adopted by Kentucky in numerous cases is that the law recognizes no exact period of time at which infants are allowed to testify and that it depends upon the individual capacity of the child to observe, recollect and narrate facts, which in the instant case was rightly determined by the court. However, the matter of admitting the unsworn testimony of the infant presents a rather unique question which it will not be necessary in this opinion to discuss or decide other than to say it seems to be the universal rule although there is no statute commanding it, but the practice seems to be universal. It might be added, however, that some jurisdictions have abolished the oath as to children while others have a statutory requirement to take the oath. In the very early case of White v. Commonwealth, 96 Ky. 180, 28 S. W. 340, 341, it was stated:

"The intelligence of the witness is the true test of competency, and that must be determined by the court, while the weight to be given to the evidence is for the jury. A child may be ignorant of God, and of the evil of lying, and of the punishment prescribed therefor, both

here and hereafter, and yet have sufficient intelligence to truthfully narrate facts to which its attention is directed.''

In the light of the above, we are confronted with the utter futility of requiring a child to take an oath when he is lacking in theological understanding, and at the same time say he has sufficient intelligence truthfully to narrate facts to which his attention is directed.

The American Law Institute in its Model Code of Evidence adopts a rather broad view and indicates an expanding attitude on the question of the requirement of an oath.

Wigmore in his treatise on evidence, Vol. 6, page 329, states:

''The special class of persons (ante, 1827, par. 2) of whom an oath ought not to be required, nor even the exercise of an option to affirm be expected, namely, *children* qualified to testify but *lacking in theological understanding,* remain unfortunately in most jurisdictions unprovided for.''

In Hodd v. Tacoma, 45 Wash. 436, 88 P. 842, a child 7 years of age was permitted to testify without being sworn and the court held it to be a technical error, but since the error was not prejudicial, declined to reverse for that reason. Since the judgment herein must be reversed because of the instruction above, and since upon a new trial the matter of swearing the infant witness can be corrected, thereby eliminating any danger of becoming victimized because of that omission, it is unnecessary at this time to determine that question.

The judgment is reversed.