Lisa Carroll SMITH, Plaintiff,

v.

FRANKLIN COUNTY,
et al., Defendants.

No. CIV.A.01–18–JMH.

United States District Court,
E.D. Kentucky,
Frankfort.

Oct. 17, 2002.

Gregory A. Bolzle, Frost Brown Todd LLC, Louisville, KY, O. Curt Davis, Somerset, KY, for Plaintiff.

Richard M. Sullivan, Conliffe, Sandmann & Sullivan, Louisville, KY, Robert L. Chenoweth, Chenoweth Law Office, Frankfort, KY, for Defendants.

## MEMORANDUM OPINION AND ORDER

HOOD, District Judge.

This action is before the Court on the defendants' motion for summary judgment [Record No. 28]. Plaintiff has responded [Record No. 38], to which Defendants have replied [Record No. 59]. This matter is now ripe for decision.

## FACTUAL BACKGROUND

Lisa Carroll Smith was incarcerated at the Franklin County Correctional Complex ("FCCC") for a ten day sentence on a misdemeanor charge of shoplifting, from December 19, 2000, to December 29, 2000. Smith indicated upon entering the FCCC that she suffered from epilepsy, asthma, and nerve damage in her spine. On the booking sheets, she reported that she was taking the prescription medications Klonopin and Dilantin, among the other drugs, and that she would suffer seizures if not timely provided these medications. She also reported that she took the hydrocodone to control pain, as needed. Plaintiff has testified that she told the admitting officer that she would need to be taken to a hospital in the event that the FCCC was unable or unwilling to provide her the medication that she needed. According to Smith, an officer present at the time retorted, "We'll take you to the hospital if we want; if we don't, we won't." (Smith depo. at 36.)

Plaintiff describes how her medications were confiscated by the FCCC nurse, Sally Maxwell, upon her admission to the facility. Smith has testified in her deposition that she was carrying only Klonopin, Prilosec, and hydrocodone with her when she entered the facility. The FCCC's admission sheet reflects that she had five bottles of medicine with her upon admission. Defendants state and Plaintiff does not contest that her prescription Dilantin, Trazadone, and Paxil were at her home. She brought with her an outdated prescription for the drug Prilosec and was told she could not have outdated medication dispensed to her while incarcerated. Smith has testified that she did not know whether or not the hydrocodone was outdated, but it was also seized. Plaintiff states that at the time she had been prescribed Klonopin for treatment of a seizure disorder but was informed she could not take it while incarcerated as it was a narcotic. The Klonopin was also seized and stored in her property box. Plaintiff also testifies that Maxwell told her she would not be permitted to take her anti-anxiety medications, Trazadone and Paxil, as prescribed while incarcerated. Plaintiff was further informed that in the event she needed to discuss something with the Maxwell she would need to fill out a medical request.

On December 19, 2000, Smith submitted a medical request form stating that she was "not being given meds for seizures." She was seen by the FCCC nurse, Defendant Sally Maxwell, on December 20, 2000. Maxwell indicated in her notes concerning the visit that someone was to bring Smith's Dilantin, her seizure medication, to her from home. Plaintiff has stated that Maxwell told her that, with regard to her

medication, that it did not matter what Smith's doctor ordered, it was her (Maxwell's) decision and "that was that." (Smith depo. at 45 & 81.)

On December 21, 2000, Smith filled out an Inmate Grievance form complaining that she would like to be given her medicines as prescribed, stating the name and phone number of the prescribing physician. The FCCC officer who reviewed the grievance form then informed Smith that the grievance process was not the appropriate forum for medical requests and that a medical request to be seen by the nurse would need to be submitted. The rejection included the comment "[a] grievance cannot direct or override a medical decision."

Smith then submitted a Medical Request form complaining that she felt "funny dizzy" and was seeing "specks floating" around her and stating that she needed her blood pressure checked. Smith did not mention her medication in the request. Also on December 21, Maxwell spoke with Smith's family physician, Kenneth Hines, who informed Maxwell that Smith was to receive 100 mg of Dilantin in the morning and 200 mg in the evening.[1] He also described the other medication he had prescribed Smith, Klonopin, Trazadone, and Paxil, and their dosages. Smith's Medication Log Sheet from her time at the FCCC states that she began receiving Dilantin on the evening of December 20, 2000, but Smith denies receiving any Dilantin until December 21, 2000, the date she believes it was delivered to the FCCC by a friend.

Defendant Maxwell saw Smith on December 22, 2000, and indicated in her notes that she had checked Smith's blood pressure and that Smith requested that she be allowed to take her Dilantin partially in the morning and partially in the evening. Smith denies having made this request. However, from the evening of December 22, 2000, her Medication Log Sheet indicates that Smith received both her morning and evening does of Dilantin until her release on the morning of December 29, 2000.

On the morning of December 22, Plaintiff alleges she was not provided a dosage of Dilantin and that Maxwell denied her medication because she had not taken a full 300 mg dose on the evening of December 21. Prior to her incarceration, Plaintiff states that she took three 100 mg tablets of Dilantin daily, one in the morning and two in the evening and that on the evening of December 21 she took only one 100 mg tablet because she was concerned about the effect a heavy dosage might have considering the alleged two-and-a-half day deprivation of the Dilantin.

On the evening of December 22, 2000, two FCCC officers were called to Smith's cell on a report that she was having a seizure. Smith states that at 7:00 p.m. she suffered one or two seizures. The officers stood on either side of her bunk until her body quit seizing and then moved her to a mat on the floor. Additional mats were placed on each side of her to prevent injury in the event she had another seizure. Smith has testified that at this time she requested to be taken to a hospital and was told that such a decision could be made only by the nurse who was not present at that time.

Smith further alleges that no medical staff was available in the FCCC over the ensuing weekend. As her seizure had occurred on a Friday, Smith submitted an-

---

**1.** Plaintiff also states that she provided Maxwell with the names of the other doctors who had prescribed her medication, however Maxwell does not recall making any attempt to contact those doctors for further information about those medications.

other Medical Request form on Monday, December 25, 2000, requesting that her blood pressure be taken and indicating that she had a rash on her left hand. She stated on the form that she needed to discuss something important with the nurse. Pam Ranquillo responded, taking Smith's blood pressure reading, weighing her, and recommending a lotion for the rash.[2] Smith alleges that this examination did not occur until December 27. Ranquillo has stated that she did not note anything in Smith's appearance that led her to believe she was not doing well and that Smith did not indicate anything regarding a seizure disorder.

However, Smith alleges that Ranquillo directed that Plaintiff be taken to a hospital immediately but that a corrections officer in attendance responded that it "made no sense" to take her to a hospital as she had only two days left in her sentence. (Smith depo. at 77–78.) Smith further states that she asked numerous jail employees to take her to the hospital and no one complied with her request. Plaintiff also complains that she experienced various manifestations of physical illness during the period between her seizure(s) on December 22 and her release on December 29, including dizziness, vomiting, and diarrhea.[3] Further she complains that she experienced severe mental and emotional distress due to her lack of treatment.

Plaintiff defines the policy, custom, and practice at the FCCC during her incarceration as being the minimization of "expense of attending to inmate medical needs." Plaintiff alleges that the Jail was underfunded, that a doctor visited the Jail only once a week as a result, and that the nurse was to deal with those incidents arising at other times. Further, Plaintiff alleges that officers had no medical training.

During Plaintiff's incarceration, Defendant James Kemper, Jr., had no direct contact with Smith or conversations with staff members regarding her nor did he have knowledge of any situation related to her medication. Kemper would have reviewed any appeal of a grievance Smith might have filed, but Smith filed no such appeal during her incarceration.

Kemper has stated that due to underfunding, the protocol was to convince an inmate to wait until the doctor's next visit to the jail except in medical emergencies and that he did not know whether his officers had received any training to distinguish when a seizure might present a medical emergency. (Kemper depo. at 11, 54–55.) Kemper did read the report prepared by a responding officer after Smith's seizure, and he has testified that the officers' response was typical and appropriate for unless an inmate's seizure is severe, the officers are to make the inmate comfortable and take measures to prevent the inmate from self injury. Further, Kemper states that Plaintiff was treated no differently than other inmates having seizures at the jail, which occur "quite often." (Kemper depo. at 52.)

Hines has stated that Smith may suffer seizures as a result of heightened anxiety

---

2. Maxwell left the FCCC at approximately 2:30 p.m. on December 22, 2000, at the end of her shift and remained on vacation leave for a period of time extending beyond the end of Smith's incarceration. Ranquillo provided nursing services at the FCCC during Maxwell's vacation under a contract with a "temp agency" for her services.

3. Smith has stated in deposition testimony that she lost ten pounds during her incarceration. However, her weight on December 27, 2000, was 132 pounds as compared to 114 pounds at the time she was booked into the jail. Hines noted her weight at 144 pounds when he saw her on the date of her release.

and stress. Maxwell has stated that she was not aware of this correlation and that she could have ordered Plaintiff's anti-anxiety medications herself during the incarceration period had she wished. However, Plaintiff was provided no anti-anxiety medication during her stay at the jail. Hines also testifies that he could not find a causal connection between the other medications Smith did not receive during her incarceration and the seizure she allegedly suffered on December 22. Hines further stated in his deposition that Dilantin taken by itself would have controlled her epilepsy if in the therapeutic range and that not receiving Klonopin would not have caused seizures. Maintaining the level of Dilantin in her system at such a therapeutic range would have required regular doses of Dilantin during the period of time leading up to her incarceration, and he testified that Smith is not a reliable patient with regard to following her prescribed treatment plan or filling prescriptions for her seizure medication.[4] Hines also states in deposition testimony that the timing of Smith's dosages would not have had adverse consequences on her health. Finally, he stated in deposition testimony that Smith suffered seizures while on medication and that she had also gone long periods of time without taking medication and remained seizure-free during those periods.

### APPLICABLE STANDARD OF REVIEW

Under Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." The moving party may discharge its burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party, which in this case is the plaintiff, "cannot rest on [her] pleadings," and must show the Court that "there is a genuine issue for trial." *Hall v. Tollett*, 128 F.3d 418, 422 (6th Cir.1997). In considering a motion for summary judgment the court must construe the facts in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### DISCUSSION

Plaintiff's complaint addresses alleged violations of federal law, 42 U.S.C. § 1983 and Title II of the ADA, and Kentucky state law, Intentional Infliction of Emotional Distress and Negligence/Gross Negligence. Defendants aver that improper defendants should be dismissed from the case and that other defendants are due varying levels of immunity for their actions. Further, Defendants assert that summary judgment may be properly granted on all counts. Upon Defendants' motion for summary judgment, this Court shall address each issue in turn.

### 1. Franklin County Correctional Complex Is Not *Sui Juris*

Defendants argue that the Franklin County Correctional Complex/Franklin County Regional Jail ("FCCC") is not a legal entity capable of being sued. Rather, as it is a facility owned and provided for by the Fiscal Court and operated by the jailer per Kentucky Constitution §§ 99

---

4. Smith also testifies that she has difficulty following the prescribed treatment plan for her condition.

and 144 and governed by Kentucky Revised Statutes, Chapters 71 and 441. Plaintiff concedes this issue, and the Court agrees that the jailer and the Franklin County are the proper defendants in this regard. Accordingly, any causes of action pending in this matter as against FCCC are dismissed with prejudice.

## 2. Federal Law Claims Against Defendants Should Not Be Dismissed for Failure to Exhaust Administrative Remedies Because Plaintiff Is Not a Prisoner for the Purposes of 42 U.S.C. § 1997e

The Prison Litigation Reform Act ("PLRA") requires prisoners that bring actions concerning prison conditions under 42 U.S.C. § 1983 and other federal law to exhaust all available administrative remedies before suing in federal court. *See* 42 U.S.C. § 1997e(a); *Booth v. Churner,* 532 U.S. 731, 736–37, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001); *Wyatt v. Leonard* 193 F.3d 876, 877 (6th Cir.1999).

Defendants argue that Plaintiff's federal claims against Defendants should be dismissed because Smith has failed to exhaust available administrative remedies pursuant to 42 U.S.C. § 1997(e).[5] Plaintiff responds that the PLRA applies only to "prisoners," not former prisoners such as Smith.[6]

The plain language of the PLRA suggests that former prisoners do not fall within its scope as §§ 1997e(a), (e), and (h) speak of those prisoners "confined in a jail, prison or other correction facility" or "incarcerated or detained," a status to be determined at the time the suit is "brought." § 1997e(a),(e), & (h). The Sixth

Circuit has yet to address this issue, but it is widely held that "prisoner" means someone confined, incarcerated, or detained, not a former prisoner. *See Abdul–Akbar v. McKelvie,* 239 F.3d 307, 314 (3rd Cir.2001); *Janes v. Hernandez,* 215 F.3d 541, 543 (5th Cir.2000); *Page v. Torrey,* 201 F.3d 1136, 1140 (9th Cir.2000); *Harris v. Garner,* 216 F.3d 970, 981 (11th Cir.2000); *Greig v. Goord,* 169 F.3d 165, 167 (2nd Cir.1999); *Kerr v. Puckett,* 138 F.3d 321, 323 (7th Cir.1998); *Doe v. McKee,* 150 F.3d 920, 924 (8th Cir.1998).

Defendants correctly note that the Sixth Circuit has advocated a broad interpretation of the applicability of the PLRA, holding that a prisoner must exhaust administrative remedies regardless of the type of relief sought. *Wyatt v. Leonard,* 193 F.3d 876 (6th Cir.1999). However, Defendants' contention that this broad interpretation should be stretched to include former prisoners does not sit well with this Court's view of the applicability of the PLRA by virtue of a reading of the plain language of the statute.

In this matter, it is clear that a literal application of § 1997(e) does not find itself "demonstrably at odds with the intentions of its drafters." *See United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (quoting *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982)). The plain language of the statute is clear and bolstered by the legislative history of § 1997e, suggesting not only Congressional intent to relieve the court system of the burden of excessive petitioning on the part of those incarcerated persons but also an

**5.** Defendants reference those claims under 42 U.S.C. § 1983 and 42 U.S.C. § 12132, the Americans with Disabilities Act (ADA).

**6.** The PLRA defines "prisoners" as "any person incarcerated or detained in any facility

who is accused of convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h).

intent to first permit those charged with the responsibility for jail and prison facilities to remedy wrongs that occur on their watch and to improve conditions for those incarcerated under their care. *See, e.g.,* 141 Cong. Rec. § 14408–01, § 14413 (daily ed. Sept. 27, 1995) (statement of Sen. Dole); *Freeman v. Francis,* 196 F.3d 641, 644 (6th Cir.1999). These goals will not be subverted by holding that the PLRA does not apply to former prisoners.

In fact, this Court finds Defendants' proposed interpretation to be nonsensical. To require former prisoners to initiate or pursue those internal, administrative remedies once they have left the confines of a facility is a strained application of § 1997e at best.[7] Former prisoners are no longer members of the community that such administrative processes and limitations are meant to serve. This is particularly so with those prisoners who are incarcerated for short periods of time as their opportunity to initiate and pursue administrative remedies while incarcerated is temporally limited at best.

■ Plaintiff was not a prisoner at the time she filed her Complaint. She was released from the FCCC on December 29, 2000, and filed her complaint on March 13, 2001. It follows that Plaintiff was not a "prisoner" subject to the requirements of the PLRA at the time she instituted suit in this matter, and her federal § 1983 and ADA claims are not thusly barred.

### 3. Plaintiff Fails to State a Claim under the ADA

Defendants contend that Plaintiff has failed to state a claim under the Americans with Disabilities Act ("ADA"), 42 U.S.C. 12131 *et seq.* For the reasons set forth below, the Court agrees.

§ 12132 of the ADA reads in pertinent part:

... [N]o qualified individual with a disability shall by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. To be subject to the provisions of Title II, a claimant must demonstrate that (1) she is disabled within the meaning of the ADA; (2) she is qualified with or without reasonable modifications to meet the essential eligibility requirements for receipt of services or participation in programs or activities of a public entity; and (3) she was denied the benefits of such programs, services or activities by reason of her disability.[8] *Id.*

■ Assuming without deciding that any of the medical conditions from which is alleged to suffer rise to the level of a qualified disability for the purposes of the ADA, the complaint and subsequent pleadings fail to specify the programs, facilities, services, activities, or benefits which Plaintiff was purportedly denied during her time at the FCCC.

Nor is there any indication as to nature of the "process" to which plaintiff claims she was due. Absent an allegation that she was denied an opportunity to participate in judicial proceedings or that she was denied some other "process" to which others inmates were entitled, Plaintiff in

---

**7.** For this reason, this Court will also decline to apply the doctrine of laches as requested by Defendants.

**8.** Title II of the ADA covers inmates in state prisons, and for the purposes of this opinion, this Court assumes without deciding that Title II will equally cover those inmates housed in a county facility such as the FCCC. *See Pennsylvania Dept. of Corrections v. Yeskey,* 524 U.S. 206, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998).

this respect has failed to state a claim. *See Carten v. Kent State University*, 282 F.3d 391 (6th Cir.2002). Accordingly, this claim will be dismissed as against all Defendants.

**4. Plaintiff Has Not Stated a Cause of Action for Violation of the Eighth Amendment's Prohibition on Cruel and Unusual Punishment**

 The Eighth Amendment of the U.S. Constitution prohibits cruel and unusual punishment. U.S. CONST. amend. XIII; *see Wilson v. Seiter*, 501 U.S. 294, 296–97, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). Eighth Amendment claims based on conduct not the penalty formally imposed for a crime require inquiry into state of mind of the acting officials. *Wilson*, 501 U.S at 302, 111 S.Ct. 2321. This standard applies to the states and, thus, to the matter at bar through the Fourteenth Amendment. U.S. CONST. amend. XIV; *Wilson*, 501 U.S. at 296–97, 111 S.Ct. 2321. However, in order to state a cognizable claim under the Eighth Amendment concerning medical care of prisoners, an inmate must "allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

When inquiring into "deliberate indifference," it is taught that a court must ask both (1) if the officials acted with a suffi-

ciently culpable state of mind and (2) whether the alleged wrongdoing was "objectively 'harmful enough' to establish a constitutional violation."[9] *Hudson v. McMillian*, 503 U.S. 1, 2, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (quoting *Wilson*, 501 U.S. at 298, 111 S.Ct. 2321); *Caldwell v. Moore*, 968 F.2d 595, 602 (6th Cir.1992).

 Looking first to the objective component of a "deliberate indifference" claim, one finds it is governed by "contemporary standards of decency." *Hudson*, 503 U.S. at 8–9, 112 S.Ct. 995. "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are serious."[10] *Id.* at 9, 112 S.Ct. 995.

 However, in the Sixth Circuit, it is taught that the inmate must show that he is incarcerated under conditions posing a "substantial risk of serious harm." *Napier*, 238 F.3d at 742. Allegations of denial of medical treatment based on a delay in treatment are to be gauged by examining the effect of the delay in treatment, which is to say that an "inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed." *Napier v. Madison County*, 238 F.3d 739 (6th

9. The Supreme Court has defined deliberate indifference as a subjective awareness of a substantial risk of harm. *Farmer v. Brennan*, 511 U.S. 825, 829, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). *Farmer* teaches that an official "must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Id.* at 837–38, 114 S.Ct. 1970.

10. Medical needs are "serious" if they have been "diagnosed by a physician as mandating

treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's treatment." *Gaudreault v. Municipality of Salem, Mass.*, 923 F.2d 203, 208 (1st Cir.) (quoting *Monmouth Co. Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3rd Cir.1987), *cert. denied* 486 U.S. 1006, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988)), *cert. denied* 500 U.S. 956, 111 S.Ct. 2266, 114 L.Ed.2d 718 (1991). It must require immediate attention. *Caldwell v. Moore*, 968 F.2d at 602.

Cir.2001) (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.,* 40 F.3d 1176, 1188 (11th Cir.1994)).

In *Napier,* an inmate who suffered from complete kidney failure claimed he was prevented from receiving dialysis treatments in violation of the Eighth Amendment prohibition on cruel and unusual punishment. However, where the treating physician testified that the missed treatment did not affect Napier's mortality or morbidity, particularly in light of the fact that Napier missed many such treatments of his own volition both before and after his incarceration, there were no facts to show a serious deprivation.

Similarly, Smith complains that her injuries arose from the delay in treatment that she experienced while incarcerated at the FCCC. However, this Court is not convinced that Smith has demonstrated the detrimental effect of the delay in medical treatment. When Smith visited with her family physician, Hines, on the day of her release from the FCCC, he simply advised her to continue her medications, and she has provided no testimony or evidence to suggest that her mortality or morbidity was seriously affected by her treatment during her incarceration. Further, both Smith and Hines have testified that she has difficulty following the regimen of medication prescribed for her medical ailments, and that her health returned to the level it was at prior to incarceration after a couple of months.[11]

■ Looking to *Napier,* this Court finds that the alleged deprivations and delay in medical care during Smith's incarceration do not rise to the level of a constitutional violation as she fails to allege facts that demonstrate the seriousness of the deprivation by showing that it adversely affected her morbidity or mortality. There is no evidence to suggest that Smith's alleged seizure was, in fact, seriously injurious or that the alleged two-and-one-half day delay in providing medication was sufficient by itself or in light of the information available to Defendants to pose a serious risk of harm to her. Further, there is no evidence suggesting that the decision made by FCCC employees not to take Smith to the hospital after her seizure episode on December 22, 2002, resulted in the type of effect on her morbidity or mortality contemplated by *Napier.*

■ Finally, the Court notes that allegations of medical malpractice or negligent diagnosis and treatment do not state a valid claim under § 1983. *Estelle,* 429 U.S. at 106, 97 S.Ct. 285. If a plaintiff has received medical attention, a court will not second-guess the judgment of the medical professionals providing such treatment. *Estelle,* 429 U.S. at 107, 97 S.Ct. 285. A plaintiff is not constitutionally entitled to a particular course of treatment on his own assessment of its necessity. A disagreement with the medical treatment received does not rise to the level of a constitutional violation. *Martin v. Sargent,* 780 F.2d 1334, 1339 (8th Cir.1985); *Sanchez v. Vild,*

11. The Court also notes that testimony of Hines demonstrating the lack of a causal connection between Defendants' alleged actions and Smith's seizure and subsequent physical symptoms. In spite of her best efforts to lay the blame for her seizure on the FCCC, Plaintiff's own habits and forgetfulness more likely laid the path to her seizure. The FCCC cannot be charged with Smith's prior failure to maintain the proper level of anti-seizure med-ications in her system or her failure to provide her medication to the facility for dispensing. The testimony of the parties does not suggest that Smith informed the officers or Maxwell of any prior dosing inconsistencies so as to alert them to the potential for a seizure nor does the testimony of Smith or her doctor suggest that she had diligently followed her dosing schedule prior to her incarceration.

891 F.2d 240, 242 (9th Cir.1989); *Estelle,* 429 U.S. at 105–106, 97 S.Ct. 285.

Smith did receive medical attention during her incarceration at the FCCC, consulting both with Maxwell and Ranquillo. After consultation with Smith's treating physician, Hines, Maxwell adopted a dosage regimen for Smith's seizure medication, Dilantin, that would be followed for the duration of her incarceration at the FCCC. This is to say that whether or not Smith agreed with the regimen prescribed for her, a disagreement evidenced by her alleged unilateral decision not to take a full dose of Dilantin on the evening of December 21, this court will not second-guess the judgment of those medical professionals recommending or providing such treatment.

As the objective requirements of seriousness has not been met on the facts of this case, this Court will not inquire into the subjective component of the test. The facts alleged do not rise to the level of a constitutional violation, and this claim will be dismissed. Further, there is no reason for this Court to delve into the matters of qualified immunity and municipal liability of the Defendants as no § 1983 violation has been established.[12]

### 5. This Court Will Not Abstain from Addressing Plaintiff's State Law Claims

 Courts may dismiss state law claims over which it has supplemental jurisdiction where all federal law claims are dismissed. *Pinney Dock & Transport v. Penn Cent. Corp.,* 196 F.3d 617, 620 (6th Cir.1999); *Taylor v. First of Am. Bank–Wayne,* 973 F.2d 1284, 1287 (6th Cir.1992). However, retaining that jurisdiction is within the broad discretion of the trial court and is based on a balancing of the interests involved: "judicial economy, convenience, fairness, and comity." *Pinney Dock & Transport,* 196 F.3d at 620; *Taylor,* 973 F.2d at 1287–88 (retaining jurisdiction in light of length of time on docket, fact that discovery was complete, and compilation of a voluminous record); *Gray v. International Ass'n of Heat and Frost Insulators and Asbestos Workers, Local No. 51,* 447 F.2d 1118, 1120 (6th Cir.1971) (holding that district court did not abuse discretion in retaining claims given the substantial time and energy expended at time federal claims were dismissed).

 The matter at hand has been on this Court's docket for more than one-and-a-half years, discovery is complete, and a voluminous record has been compiled. These factors favor the Court's retention of state law claims even in light of the dismissal of all of Plaintiff's federal claims, and the Court elects to do so.

### 6. Franklin County Fiscal Court, the Defendant Kemper and His Official Capacity, and Defendant Maxwell in her Official Capacity Are Entitled to Sovereign Immunity with Regard to those State Law Claims Alleged Against Them

 Kentucky law teaches that official capacity claims that are in essence claims alleging negligent operation of the jail are claims against the county, and that the jailer, in his official capacity, is cloaked with the county's sovereign immunity as pronounced by the authority of *Com. v. Harris,* 59 S.W.3d 896, 899 (Ky.2001); *Cullinan v. Jefferson County,* 418 S.W.2d 407,

---

**12.** Simply stated, a finding of such a violation is prerequisite to either immunity or liability. See *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *Monell v.* *New York City Dep't of Social Servs.,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

408 (Ky.1967). Defendant Maxwell, the nurse and a member of the jail staff, and the officers of the FCCC also wear this sovereign immunity in their official capacity. *See Harris*, 59 S.W.3d at 899. Accordingly, any pendant state law claims will be dismissed with prejudice as to Franklin County, Kemper, Maxwell, and the John Doe officers insofar as they have been sued in their official capacities.

### 7. Official Immunity for Kemper and Maxwell in Their Individual Capacities for the State Law Claims Depends on the Ministerial or Discretionary Nature of the Acts of Which Plaintiff Complains

 In Kentucky, official immunity is available to governmental employees sued in their individual capacity for acts performed in the exercise of their discretionary functions, a decision resting "not on the status or title of the officer or employee, but on the function performed." *Yanero v. Davis*, 65 S.W.3d 510, 521 (2001); *Thompson v. Huecker*, 559 S.W.2d 488 (Ky.App.1977). Discretionary functions are "those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment." [13] *Id.* at 522. By contrast, immunity is not afforded to a public officer or employee regarding the negligent performance of ministerial acts, or those that "require only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Id.*

 With regard to Defendant Kemper, his involvement in Smith's period of incarceration was limited as he had no direct contact with her during that time. While Kentucky law imposes a specific duty on jailers to "exercise reasonable and ordinary care and diligence to prevent unlawful injury to a prisoner placed in his custody," his potential liability in this matter is first circumscribed by other case law teaching that public officers in Kentucky are not responsible for the negligence of those employed by them if they have employed persons of suitable skill. *Franklin County v. Malone*, 957 S.W.2d 195, 199–200 (Ky.1997) (overruled on other grounds by *Yanero*, 65 S.W.3d at 523); *Moores v. Fayette County*, 418 S.W.2d 412 (1967); *Lamb v. Clark*, 282 Ky. 167, 138 S.W.2d 350, 352 (1940); *Ratliff v. Stanley*, 7 S.W.2d 230, 232 (1928). The

---

**13.** Kentucky courts follow the approach taken in the *Restatement (Second) of Torts* §§ 895D(3) (Tentative Draft No. 19, 1973) and conclude that a court must not only consider whether the particular activity should be characterized as a discretionary function but also determine the degree of immunity or privilege afforded the officer. *Thompson*, 559 S.W.2d at 496. In Kentucky, official immunity for discretionary acts is subject to a "good faith qualification." *Yanero*, 65 S.W.3d at 523 (citing *Thompson*, 559 S.W.2d at 496 and *Ashby v. City of Louisville*, 841 S.W.2d 184, 189 (Ky.App.1992)). Looking to the United States Supreme Court's discussion of the issue in *Wood v. Strickland*, the Kentucky courts have held that qualified immunity would be defeated if an official *"knew or reasonably should have known* that the action

he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], *or* if he took the action *with the malicious intention* to cause a deprivation of constitutional rights or other injury...." *Id.* (quoting *Wood v. Strickland*, 420 U.S. 308, 322, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975)(emphasis in original)). Accordingly, " 'bad faith' can be predicated on a violation of a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position, *i.e.,* objective unreasonableness; or if the officer or employee willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive." *Id.* (citing 63C Am. Jur.2d, *Public Officers and Employees*, §§ 333 (1997)).

evaluation of the credentials of a potential employee is "an inherently subjective process which is the essence of a discretionary function." *Yanero*, 65 S.W.3d at 528. As the hiring of employees has a ministerial aspect only insofar as one must attempt to hire someone who is not incompetent, only a showing that Kemper knowingly hired an incompetent person could result in his personal liability for Maxwell's actions. *Id.* Smith does not allege that Kemper employed persons of less than suitable skill even though she complains of her medical treatment while incarcerated at the FCCC and while under Maxwell's care.

Further, while Plaintiff attempts to demonstrate Kemper's negligence for his failure to act upon review of the seizure incident report prepared by officers, this Court finds that this act was among "those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment." *Id.* at 522. While Kentucky law imposes a specific duty on Kemper to safeguard the prisoners in his care, his decision not to take further action upon his review of such a report remains a discretionary act, within his exercise of judgment and he is immune from liability in this matter.[14]

■ In sharp contrast, "[t]he administration of medical care is a ministerial function by employees, including doctors. Compliance with the applicable standard of care does not involve a discretionary governmental function." *Gould v. O'Bannon*, 770 S.W.2d 220, 222 (Ky.1989).[15] Accordingly, the actions of Defendants Maxwell who attended Smith during her incarceration will be considered ministerial under Kentucky law, and she is not due official immunity in her individual capacity for the administration of medical care provided to Plaintiff.

■ Finally, the Court turns to the John Doe officers and employees named as defendants in this matter. It is the opinion of this Court that their actions, in their daily interaction with Plaintiff, in their response to her alleged seizure episode, and in facilitating her subsequent requests for medical care are discretionary in nature. The independent judgment exercised by these individuals in responding to the jail cell incident and in determining whether or not to call for a medical care provider is not of the ministerial nature described in *Gould*, a case that contemplates the acts of a defendant health care professional. *See Gould*, 770 S.W.2d 220 (three doctors were members of anesthesiology team and were allegedly negligent in regard to the insertion of a needle for a catheter which cut the patient's artery causing cardiac arrest

---

14. As the Court has also determined that Plaintiff has failed to demonstrate a violation of constitutional, statutory, or other clearly established right nor has she alleged facts that would reveal the requisite maliciousness, it is clear that Kemper's immunity is intact for any violation vis à vis the good faith requirement.

15. The Court notes that *Gould* was distinguished by the Kentucky Supreme Court in the case of *Franklin County v. Malone*. *Malone*, 957 S.W.2d at 203 (holding that government officers or employees acting within the scope of her employment would always be immune from liability for negligent performance of official responsibilities). However,

*Yanero* has since overruled *Malone* in a move by the Kentucky Supreme Court that overhauled the approach to the doctrine of official immunity. *Yanero*, 65 S.W.3d at 523. Neither *Malone* nor *Yanero* directly or indirectly addressed the issue of whether administration of medical care is a ministerial or a discretionary function. Accordingly, this rule of law, as stated in *Gould*, is presumed to remain in force as it has not been expressly overruled and has been cited several times since the decision in *Malone*. *See Withers v. University of Kentucky*, 939 S.W.2d 340, 350 (Ky.1997); *Ashby*, 841 S.W.2d at 188.

and ultimately death). Nor is their otherwise qualified immunity defeated by a showing that the Defendant officers *"knew or reasonably should have known* that the action [they] took within [their] sphere of official responsibility would violate the constitutional rights of the [plaintiff]" or that they acted with malicious intent so as to "cause a deprivation of constitutional rights or other injury. . . ." As stated earlier, the facts alleged do not lead to the conclusion that the Eighth Amendment or other rights of the Plaintiff were violated by the actions of the John Doe Defendants. In any event Plaintiff does not allege facts that reveal negligence or the requisite maliciousness or intent to cause harm on the part of the John Doe Defendants.

### 8. State Law Claims

#### 1. Plaintiff Has Failed to State a Claim of Negligence Against Defendants Maxwell and the John Doe Officers and Employees of the FCCC

■ Negligence, under Kentucky law, requires a showing of duty, breach of duty, and resulting injury. *Workman v. Columbia Natural Resources,* 864 F.Supp. 638, 641 (E.D.Ky.1994) (citing *Watters v. TSR, Inc.,* 904 F.2d 378, 380 (6th Cir.1990)).

Assuming without deciding that Defendants Maxwell and the FCCC officers and employees owed a duty of care to Plaintiff, either as a result of a special relationship between nurse and patient, in consideration of Smith's custodial status at the time of the alleged wrongful conduct, or due to the universal obligation of care owed by every person to exercise ordinary care so as to prevent foreseeable injury to others, Plaintiff has not demonstrated that her alleged injuries were in fact caused by Defendants' actions. *See Fryman v. Harrison,* 896 S.W.2d 908, 910 (Ky.1995) (citing *Ashby,* 841 S.W.2d 184); *Workman,*

*864 F.Supp. at 641* (citing *Watters,* 904 F.2d at 380).

■ Negligence may be premised on an omission as well as positive acts, and the consequence is the same. *NKC Hospitals, Inc. v. Anthony,* 849 S.W.2d 564, 567 (Ky.App.1993). "It must be admitted that negligence, as a basis of civil liability, imports absence of care in performing an act or an omission or failure to do something that ought to have been done." *Meeks Motor Freight v. Ham's Adm'r,* 302 Ky. 71, 193 S.W.2d 745 (1945) (quoted in *NKC Hospitals, Inc.,* 849 S.W.2d at 567). However, Plaintiff has not stated facts that would permit this Court to find that Defendants' omissions caused her stated injury, the seizure episode and alleged subsequent suffering.

Smith's treating physician indicates that he could not find a definitive causal connection between the fact that Smith did not receive certain medications during her incarceration and the seizure she allegedly suffered on December 22. It is notable that Hines testified in his deposition that Dilantin taken by itself could have controlled her seizure condition if it was maintained within the therapeutic range in her system and that not receiving prescribed doses of Klonopin would not necessarily have caused seizures. Maintaining the level of Dilantin in her system at such a therapeutic range would require regular doses of Dilantin during the period of time leading up to her incarceration, and both Hines and Smith have testified that she is not a reliable patient with regard to following her prescribed treatment plan or filling prescriptions for her seizure medication. Further, Hines stated in deposition testimony that Smith had suffered past seizures while on medication and that she had also gone long periods of time without taking medication and remained seizure-free during those periods. With regard to

the doses of Dilantin that Smith did receive while incarcerated, Hines has testified in deposition that the timing of Smith's dosages would not have had adverse consequences on her health or control of seizure activity.

 When the testimony of Smith and Hines is considered in combination with the medical care Smith received at the FCCC and her own failure to bring her proper medication with her to the FCCC, the "but-for" explanation offered by Plaintiff falls short. This Court is not convinced that Defendants' actions caused Smith's seizure episode. Rather, it appears that a series of factors, both events and omissions under Smith's control, led up to the seizure episode on the night of December 22. Absent a stronger correlation between the Defendants' actions and Smith's seizure episode and upon the facts as related by the Plaintiff, this Court will not charge Defendants with the Plaintiff's apparent failure to follow through with a prescribed course of treatment and to be her own best advocate for her medical care. While the Court recognizes that it was not beneficial to Plaintiff to miss 2–3 doses of her anti-seizure and other medications, Defendants' responsibility for her seizure is hardly cognizable on the facts alleged.

Even construing as a breach of duty the subsequent failure of the FCCC officers and employees to seek medical care for Plaintiff after she suffered her seizure, the Court does not find that Smith has stated an injury for the purposes of creating a cognizable negligence claim against the John Doe Defendants. In addition to that testimony casting doubt on the existence of

a connection between Defendants' alleged omissions and Smith's seizure and subsequent physical symptoms, Plaintiff has not alleged any subsequent or lasting impact on her well-being so as to state an injury in regard to any remaining allegations of negligence she might separately maintain against the Defendant officers and employees during her post-seizure incarceration period.

Accordingly, the Plaintiff has failed to demonstrate that the actions or omissions of Defendants Maxwell and the John Doe Defendants caused her seizure or subsequent symptoms, and having failed to indicate any additional injury, her claim will be dismissed with prejudice.

**2. Plaintiff Has Failed to State a Claim of Outrageous Conduct Against Defendants Maxwell and John Doe Officers and Employees in Their Individual Capacities**

 Kentucky has adopted the teaching of the *Restatement (Second) of Torts* in recognizing claims of outrageous conduct.[16] *Craft v. Rice*, 671 S.W.2d 247 (Ky.1984). Accordingly, the Plaintiff must show (1) intentional or reckless conduct by the purported wrongdoer, (2) proof of conduct so outrageous and intolerable that it offends against the generally accepted standards of decency and morality, (3) a causal connection between the wrongdoer's conduct and the emotional distress, and (4) emotional distress that is severe. *Id.* at 251; *Osborne v. Payne*, 31 S.W.3d 911, 913–14 (Ky.2000). Additionally, the Plaintiff must demonstrate that the Defendants solely intended to cause the plaintiff emotional distress when engaging in the con-

---

**16.** The tort of outrageous conduct or intentional infliction of emotional distress is generally considered a "gap-filler tort" in Kentucky, closing the otherwise unnamed space surrounding assault, battery, and negligence.

Unlike those causes of action, outrageous conduct is premised on the intent of the defendant to cause extreme emotional distress in the person of the plaintiff. *See Brewer v. Hillard*, 15 S.W.3d 1, 8 (Ky.App.1999).

duct. *Gross v. Citizens Fidelity Bank Winchester*, 867 S.W.2d 212, 215 (Ky.App. 1993); *Rigazio v. Archdiocese of Louisville*, 853 S.W.2d 295, 299 (Ky.App.1993).

■■■■ The evaluation of the criteria should be "stringent," and the action must be "utterly intolerable in a civilized community," a type of "harassment intended to cause extreme emotional distress."[17] *Stewart v. Pantry, Inc.*, 715 F.Supp. 1361 (W.D.Ky.1988). An action for outrage will not lie for "petty insults, unkind words and minor indignities"; the action only lies for conduct which is truly "outrageous and intolerable." *Kroger Co. v. Willgruber*, 920 S.W.2d 61, 65 (Ky.1996). However, a special relationship between the parties may make otherwise tenable conduct outrageous. *Osborne*, 31 S.W.3d 911 (holding that plaintiff had special relationship with priest as marriage counselor and that whether special relationship was violated in outrageous fashion where priest had affair with plaintiff's former wife precluded summary judgment for priest).

As a preliminary matter, the Court remarks that there is no doubt friction between those incarcerated and the jailhouse employees. By the nature of incarceration, free choice by inmates is curtailed, and it is to be anticipated that certain actions that an individual would take in the ordinary course of his or her day will be thwarted by that incarceration. Free choice would ordinarily include exercising preferences in medical treatment, and naturally that free choice will be curtailed in some manner while incarcerated. This Court is of the opinion that such a curtailing of free choice does not, by itself, rise to the level of actionable outrageous conduct.

Plaintiff argues that the alleged failure of Maxwell and the John Doe Defendants to provide proper medication and medical treatment before and after Plaintiff's seizure episode on December 22 create a genuine issue of material fact as to whether or not Defendants' conduct constitutes outrageous conduct. Plaintiff avers that the special relationship between the FCCC employees and Smith makes the conduct all the more egregious.

■■■■ Assuming without deciding that a special relationship between the parties existed due to Smith's custodial status, Maxwell and the officers' behavior still does not rise to the required level of outrageousness anticipated by Kentucky

---

**17.** The Court notes that Kentucky courts have focused on the duration of the treatment and the relationship of the parties in determining what constitutes outrageous conduct. *See Craft*, 671 S.W.2d 247 (maintaining surveillance of plaintiff, telling her on the CB radio that her husband would be put in jail, and driving so as to force her into an opposing lane of traffic rose to the level of conduct necessary for claim of outrageous and intolerable conduct against a police officer); *Humana v. Seitz*, 796 S.W.2d 1 (1990) (curt and insensitive comments for patient to "shut up" and that the hospital would dispose of her dead baby were neither extreme nor outrageous nor intentionally or recklessly the cause of severe emotional distress even where nurses had ignored the plaintiff's cries for help through her distress and plaintiff had delivered the baby into a bedpan, dead on arrival); *Wilson v. Lowe's Home Center*, 75 S.W.3d 229 (Ky.App.2001) (holding that reasonable minds could differ as to whether racial remarks made on a daily basis by coworkers and supervisors for period of seven years constituted outrageous conduct and that determination was subject to determination by jury); *Burgess v. Taylor*, 44 S.W.3d 806 (Ky.App.2001) (lower court properly submitted claim of outrage to jury where defendants had sold plaintiff's beloved horses to slaughterhouse and evidence showed that defendants were aware of her attachment to the animals and that plaintiff had suffered severe emotional distress); *Brewer v. Hillard*, 15 S.W.3d 1 (Ky. App.1999) (constant lewd name calling and multiple unsolicited and unwanted requests for homosexual sex rose could rise to the level of outrageous conduct and was appropriate for determination by jury).

courts. Smith carried out-of-date prescriptions with her upon admission to the FCCC. Another prescription medication was a narcotic that could not be dispensed at the FCCC. Plaintiff failed to provide her prescription Dilantin to the staff upon her arrival at the FCCC. She left it at home, knowing she would need it during her incarceration, and the staff awaited its arrival in order to dispense it to her. FCCC officers responded and protected her from injury during the seizure episode suffered during her incarceration. While the officers did not take the Plaintiff to the hospital immediately following her seizure episode or in the days following as she requested, Plaintiff did receive her medication as scheduled during that period and continued to receive medical attention within the FCCC at her request.[18] From these facts, there is no indication that Maxwell or the John Doe officers and employees had the requisite intent or recklessness to commit an actionable outrageous act.

The words and actions alleged by Plaintiff indicate the type of "petty insults, unkind words and minor indignities" one might anticipate in a correctional facility, but they do not rise to the level of outrageous conduct, nor does the duration or frequency of the alleged behavior extend to that point that the case law would recognize as creating otherwise relatively isolated incidents actionable. Accordingly, this claim will be dismissed.

## 9. Conclusion

Effectively, Plaintiff has not alleged facts that would require this Court to deny Defendants' motion for summary judgment. Plaintiff fails to state a claim under Title II of the ADA, and, as described, the

behavior and incidents alleged do not rise to the level of an Eighth Amendment violation for the purposes of the 42 U.S.C. § 1983 claim or cognizable claims of negligence or outrageous conduct. In any event, the FCCC is not a proper party to this matter, and all Defendants are due sovereign immunity from suit under state law in their official capacity for their alleged actions and all except Defendant Maxwell are due official immunity for the same.

Accordingly, **IT IS ORDERED**:

(1) that Defendants' Motion for Summary Judgment [Record No. 28] be, and hereby is, **GRANTED**;

(2) that all claims pending in this matter be, and hereby are, **DISMISSED WITH PREJUDICE**.

---

**18.** While Smith has testified that Ranquillo recommended that she go to the hospital for further care, Plaintiff does not indicate that she experienced any post-seizure medical problems that could be construed as worthy of hospitalization in that time.